SLAPPEY DRIVE INDUSTRIAL PARK, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

John W. CROUCH and First State Bank & Trust Co., Executor of the Will of Katherine S. H. Crouch, Deceased, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

Emily Jean HALEY, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

LAKE PARK, INC., Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

Spencer C. WALDEN, Jr. and Cornelia H. Walden, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

SHERWOOD ACRES, INC., Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

FOREST ESTATES, INC., Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

CAIRO DEVELOPERS, INC., Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

Loretta Haley McKNIGHT,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

William T. HALEY, Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

LAKE PARK ADDITIONS, INC.,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

PECAN HAVEN, INC.,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

Nos. 75–1885 thru 75–1896.

United States Court of Appeals,
Fifth Circuit.

Oct. 19, 1977.

H. H. Perry, Jr., Albany, Ga., for plaintiff-appellant.

Ronald T. Knight, U. S. Atty., John D. Carey, Asst. U. S. Atty., Macon, Ga., Scott P. Crampton, Asst. Atty. Gen., Jeffrey S. Blum, Atty., U. S. Dept. of Justice, Tax Div., Washington, D. C., Gilbert E. Andrews, Acting Chief, App. Section, Leonard J. Henzke, U. S. Dept. of Justice, Washington, D. C., for defendant-appellee.

Before TUTTLE, GOLDBERG and RONEY, Circuit Judges.

GOLDBERG, Circuit Judge.

This tax refund suit involves seven closely held real estate development corporations that Spencer C. Walden, Jr. organized and manages. The first issue, the one most extensively debated by the parties, is whether certain purported debts that the corporations owed their shareholders should be treated for tax purposes as contributions to capital. The second issue is whether one of the seven corporations was formed primarily for tax-avoidance purposes, thus precluding it from claiming the corporate surtax exemption. The final question is whether three parcels of land were held by two of the corporations primarily for sale to customers in the ordinary course of business, precluding capital gains treatment. The district court, *Cairo Developers, Inc. v. United States*, D. C., 381 F.Supp. 431, resolved each issue in the government's favor. We affirm.

I. Facts

Spencer C. Walden, Jr. is a successful real estate developer in Albany, Georgia, a city of some 100,000 located less than 50 miles southeast of Plains. Acting primarily through the partnership of Walden & Kirkland, Walden has developed numerous residential subdivisions and various commercial properties. This case concerns a subset of his activities.

Among the properties Walden has developed are several tracts originally owned by his father-in-law, J. T. Haley, and Haley's

descendants.[1] With Walden directing organizational efforts, members of the Haley family formed six corporations over a fifteen year period. Those corporations were Pecan Haven, Inc. (Pecan Haven), Lake Park, Inc. (Lake Park), Sherwood Acres, Inc. (Sherwood), Lake Park Additions, Inc. (Additions), Forest Estates, Inc. (Forest Estates) and Slappey Drive Industrial Park, Inc. (Slappey). Each of these is a party to this case. The other corporate party is Cairo Developers, Inc. (Cairo Developers), which Walden formed in conjunction with two individuals not members of the J. T. Haley family.

Walden was the moving force behind each of these corporations. He was president of each enterprise, and his partnership, Walden & Kirkland, handled their development work. All but Slappey were to develop residential subdivisions; Slappey's project was an industrial park.

On this appeal the government asserts that Additions was formed primarily for tax-avoidance purposes and that Sherwood and Additions held certain property for sale rather than for investment. The government further contends that purported debts that each corporation owed its shareholders

should receive equity treatment. The debts arose from eight transfers of land (ostensibly credit sales) and three transfers of money (ostensibly loans) that the shareholders made to the corporations. We develop the facts relevant to these contentions by discussing the corporations in the order of their incorporation,[2] referring to the contested transfers by alphabetical labels.

*Pecan Haven.* Pecan Haven was formed in June 1947. The shareholders were Walden (1 share), his wife Cornelia Haley Walden (59 shares) and her twin sister Loretta Haley (60 shares). They paid $12,000 for their shares. Pecan Haven developed several tracts obtained from Loretta and Cornelia and later developed a tract purchased from their father J. T. Haley.

Transfer A occurred July 26, 1960. Spencer Walden transferred 69.435 acres to the corporation in exchange for its $65,000 five-year 3% installment notes. Appellants assert that the corporation's book net worth at that time was $83,000 and that its "true" net worth, taking into account the appreciated value of its real estate holdings, was $476,000. The corporation failed to make

---

1. The following chart illustrates the relationships.

```
 J. T. Haley
 ┌───────────────────────┼───────────────────────────┐
 Joel T. Haley, Jr. Loretta Haley Cornelia Haley Walden
 (Katherine S. Haley) (Spencer C. Walden, Jr.)
 ┌─────────┴─────────┐ ┌──────────┼──────────┐
 William T. Emily Jean Spencer Loretta William
 Haley Haley Thomas Gayle Walden
 Walden Walden
```

After Joel T. Haley, Jr. died in 1955, Katherine remarried and changed her name to Katherine S. Haley Crouch. We use Katherine S. Haley throughout this opinion. She has died, and her executor is pursuing this refund claim. Subsequent to the events in question, Loretta Haley married, and she brings her refund claim in the name Loretta Haley McKnight. We refer to her as Loretta Haley throughout this opinion.

2. This appeal actually involves twelve separate refund suits, one brought by each of the seven corporations and five brought individually by shareholding members of the Haley family. The individual suits turn on the propriety of the Commissioner's classification as equity of the contested transfers to the corporations, raising

no issues not present in one of the corporate suits. The tax years in question are those ending in 1961 through 1965, though some of the actions involve fewer years. The taxes contested in these suits total about $350,000 plus interest, and the amount of tax liability affected in these and other years will presumably run much higher.

Because the facts are crucial in cases of this type, we set them forth in plentiful detail. Our discussion may rank with any drug on the market as a cure for insomnia, though we trust that our version of "the Waldens" will prove more lively than a current Thursday night television series.

timely payments of principal or interest, and $20,000 remains outstanding.[3]

*Lake Park.* J. T. Haley's three children—Joel T. Haley, Jr., Cornelia and Loretta—organized Lake Park in November 1950 intending to develop lands they held jointly. They took equal shares of the corporation's stock, for which they paid a total of $28,000. The corporate books reflected the contributions as $9,000 paid-in capital and $19,000 paid-in surplus. The corporation immediately acquired land from its shareholders that it developed.

Transfer B occurred September 7, 1954. The shareholders transferred 100 acres to the corporation in exchange for $10,000 cash and a $40,000 demand note bearing 4% interest. Appellants contend that at the time of the transfer the corporation's net worth was $50,000 and that its "true" net worth was $78,000. Lake Park made irregular principal payments and retired the note in 1959. The corporation did not pay interest as provided in the note, making only a single $2,500 interest payment in 1956.

*Sherwood.* The Lake Park shareholders —Joel, Cornelia and Loretta—formed Sherwood in September 1954. Each took one-third of the new corporation's stock, for which they paid a total of $21,000. The next day they made transfer C, conveying to the corporation 48 acres in which each owned a one-third undivided interest. In exchange the corporation paid $6,000 cash and an $18,000 demand note bearing 4% interest. The corporation made irregular principal payments and a single interest payment, retiring the debt in 1960.

By the time of the second contested Sherwood transaction, Joel had died, leaving to his wife Katherine and his two children equal portions of his stock and the remaining property owned in conjunction with the other shareholders. This new lineup of shareholders made transfer D in January 1960. In exchange for 126.48 acres, the corporation issued five-year 3% notes to each shareholder totalling $189,720.02.[4] Appellants assert that at that time the corporation had a book net worth of $62,000 and a "true" net worth of $206,000. Sherwood made irregular principal and interest payments, and a $32,000 balance remains outstanding.[5]

Transfer E occurred in December 1964 when Sherwood's shareholders conveyed an additional 84.252 acres to the corporation. In exchange they received five-year 5% notes totalling $126,000. Appellants contend that the corporation had a $117,000 book net worth and a $240,000 "true" net worth. In September 1965 the corporation retired the notes held by Katherine and her two children. The corporation has made no payments on the notes held by Loretta and Cornelia. The corporation made an interest payment to Katherine and her children in 1965 and made annual interest payments to Loretta and Cornelia from 1967 through 1971.

On July 7, 1965, Sherwood sold .99 acres of the tract it had received in 1954 from its shareholders. The land was part of 3.71 acres that the corporation had not divided into residential lots and which were identified on the recorded plat as "reserved for business" and described in the corporate books as a "land reserve." Texaco, the purchaser, had initiated negotiations for the sale; Sherwood had not solicited buyers. Texaco used the land for a gas station.[6] Sherwood originally reported the profit on

---

3. The appendix provides a detailed payment summary for this and the other contested transactions.

4. The transaction originally involved 142.78 acres and $214,170.03. In August 1961 the parties discovered an error regarding the amount of land and adjusted the price accordingly. The corporation issued new notes bearing the original date and maturity for the adjusted price.

5. The corporation retired the notes payable to Katherine and Emily in 1964. Of the remaining $32,000 balance, $12,000 each is owed to Loretta and Cornelia and $8,000 is owed to William.

6. The corporation conveyed the remainder of the 3.71 acre tract to a church in 1959.

the Texaco sale as ordinary income but now seeks capital gains treatment.[7]

*Additions.* In June 1959 Loretta, Cornelia and Katherine formed Additions, each taking one-third of its shares and contributing a total of $36,900 paid-in capital. Katherine's two children did not participate. The shareholders and Katherine's children immediately made transfer F, conveying 268.8 acres to the corporation in exchange for five-year 3% notes totalling $368,200.[8] The corporation made no principal or interest payments until 1964. From 1964 until 1969 it made annual interest payments. It has made a single principal payment, for $5,000 in 1965.

Transaction G occurred August 2, 1961. Loretta advanced the corporation $61,250, taking in return its one-year 5% note. The corporation made its first payment on the note in 1964 and retired the note in 1965.

After conducting a topographical survey of the land it had received from its shareholders in 1959, Additions discovered that nearly three acres could not be incorporated into the planned residential subdivision because of drainage problems. The corporation abandoned its initial plan regarding this tract and did not subdivide it into lots. The corporation did not break the parcel out separately on its books but carried it in the same account that included all undeveloped land. In 1963 Georgia Power Company approached Additions and bought two acres for a substation, and the City of Albany contacted Additions and purchased the remainder of the tract for a pumping station. Georgia Power paid $7,500 for its parcel and the city $2,500. Additions claims that this land had been held for investment, making capital gains treatment appropriate.

*Forest Estates.* In September 1959 Loretta Haley and Marjorie Scherberger formed Forest Estates, each taking half its stock, for which they paid a total of $25,000. They immediately effected transfer H, conveying to the corporation 43.93 acres that they owned jointly in exchange for five-year 4% notes totalling $100,000. Forest Estates made no principal payments on the notes until 1971, and $70,000 remains outstanding. The corporation made small and irregular interest payments from 1961 through 1967. Forest Estates suffered losses in 1965 and 1966 and apparently abandoned development plans.

*Cairo Developers.* Spencer C. Walden, Jr., George M. Kirkland, Jr., and J. Norwood Clark formed Cairo Developers in April 1961. Kirkland was Walden's partner in Walden & Kirkland. Clark was a real estate broker from Cairo, Georgia, who owned the bulk of the land that Cairo Developers was to develop. Each organizer took one-third of the corporation's stock, paying in a total of $5,100. From May 1961 through January 1964, the corporation received ostensible loans from the three shareholders, the Walden & Kirkland partnership, a corporation that Walden and Kirkland owned, and two of Walden's children. These advances together constitute transfer J.[9] Most of these notes were due in one year; a few were payable on demand. The corporation made no payments of principal or interest until 1971.

*Slappey.* On July 7, 1962, Cornelia Haley Walden organized Slappey, paying $9,000 for all its issued stock. On July 9 she transferred the stock in equal segments to her three children. The next day Cornelia made transfer K, conveying 80.78 acres to the corporation in exchange for $6,366.50 cash and an eight-year 4% note for $75,000. Slappey planned to develop the land for industrial and commercial establishments.

**7.** Sherwood contended in the court below that a portion of the 1960 transfer from its shareholders had also been held for investment. Sherwood carried the property on its books as "Land Investment" and on the recorded plat did not subdivide the tract into lots. The corporation made five sales from the area for residential usage in the fiscal years ending in 1964 and 1965. Sherwood has apparently abandoned its claim for capital gains treatment of these sales.

**8.** The notes of Cornelia, Loretta and Katherine were subordinated to the children's notes.

**9.** The appendix provides details regarding the dates, amounts, terms, and lenders.

The corporation made irregular principal and interest payments, failing to pay the debt on its due date.

Transfer L occurred May 27, 1963. Each of the three shareholders advanced the corporation $5,000 in exchange for one-year 6% notes. Slappey has made no payments of principal or interest on these notes.[10]

*Overview.* We may assume, as appellants contend, that in each ostensible sale of property to a corporation the price reflected the fair market value.[11] Nonetheless, the recurring pattern in regard to all the loans has been the corporations' failure to adhere to the announced repayment schedules. Although the corporations did make some principal and interest payments, in not a single case did the payments conform to the terms included in the notes. In addition, Spencer Walden's deposition testimony makes clear that the creditor-shareholders viewed their situation not at all as normal creditors would. The shareholders entered no objections to the passing of payment dates and requested payments only when the corporations had "plenty of cash." In explaining the willingness to tolerate delinquencies even when interest was not being paid, Walden candidly stated that the individuals were more concerned with their status as shareholders than in their status as creditors.

## II. Debt-Equity

The tax code provides widely disparate treatment of debt and equity. In regard to a typical transfer at issue here, involving an individual's transfer of property to his corporation in exchange for the instrument in question, the classification as debt or equity may affect the taxation of the original transaction,[12] the resulting bases and hence the taxation of subsequent transfers,[13] and the taxation of payments the corporation makes to the shareholder with respect to the instrument.[14] In the case at bar debt classification would greatly benefit the taxpayers.

■ Unfortunately, the great disparity in the tax treatment of debt and equity does not derive from a clear distinction between those concepts. The problem is particularly acute in the case of close corporations, because the participants often have broad latitude to cast their contributions in whatever form they choose. Taxpayers have often sought debt's advantageous tax treatment for transactions that in substance more closely resembled the kind of arrangement Congress envisioned when it enacted the

---

**10.** The characterization of this transaction as debt or equity apparently does not affect any of the tax years in question here. Although the corporation originally claimed a deduction for an $82.50 accrual of interest in 1963, it now concedes that the amount is not deductible because it was not paid within 2½ months of the fiscal year's close. See 26 U.S.C. § 267. The characterization of the transaction retains significance, however, with respect to payments the corporation may make in the future.

**11.** We note also that the ostensible lenders took no security interests in the transferred property or otherwise and that, with a single exception, *see* note 8 *supra*, the debts at issue were not subordinated to other corporate obligations.

**12.** *See* I.R.C. § 351. That section provides that no gain or loss is recognized when persons transfer property to their controlled corporation solely in exchange for "stock or securities." The term "stock" would include the instruments here if they were characterized as equity. The term "securities" might or might not extend to them if characterized as debt;

the term encompasses some debt instruments but not others. As an alternative to its argument that the transactions here are equity, the government contends that even if characterized as debt the property transfers come within § 351 as "securities." In light of our acceptance of the government's primary argument, we need not pass on its alternative contention.

**13.** *See, e. g.,* I.R.C. § 362. In the instant case the transferring shareholders' bases in their land were significantly lower than the sales prices. Thus the difference between new basis and carryover basis is important.

**14.** The corporation may deduct interest on indebtedness, *see* I.R.C. § 163, but if the transaction is characterized as equity, ostensible interest payments become non-deductible dividends. In general, the recipient is not taxable on loan principal payments but is taxable if the transaction constitutes equity; in that instance the purported principal payments come in for dividend treatment. *See* I.R.C. § 316.

equity provisions. *See Nassau Lens Co. v. Commissioner*, 308 F.2d 39, 44–46 (2d Cir. 1962) (Marshall, J.). Thus the labels that parties attach to their transactions provide no guarantee of the appropriate tax treatment. *See, e. g., Tyler v. Tomlinson*, 414 F.2d 844, 850 (5th Cir. 1969); *Berkowitz v. United States*, 411 F.2d 818, 820 (5th Cir. 1969).

■ Articulating the essential difference between the two types of arrangement that Congress treated so differently is no easy task. Generally, shareholders place their money "at the risk of the business" while lenders seek a more reliable return. *See Midland Distributors, Inc. v. United States*, 481 F.2d 730, 733 (5th Cir. 1973); *Dillin v. United States*, 433 F.2d 1097, 1103 (5th Cir. 1970). That statement of course glosses over a good many considerations with which even the most inexperienced investor is abundantly familiar. A purchaser of General Motors stock may bear much less risk than a bona fide lender to a small corporation. *See Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968).

Nevertheless, the "risk of the business" formulation has provided a shorthand description that courts have repeatedly invoked. Contributors of capital undertake the risk because of the potential return, in the form of profits and enhanced value, on their underlying investment. Lenders, on the other hand, undertake a degree of risk because of the expectancy of timely repayment with interest. Because a lender unrelated to the corporation stands to earn only a fixed amount of interest, he usually is unwilling to bear a substantial risk of corporate failure or to commit his funds for a prolonged period. A person ordinarily would not advance funds likely to be repaid only if the venture is successful without demanding the potential enhanced return associated with an equity investment. *See Curry v. United States*, 396 F.2d 630, 634 (5th Cir.), *cert. denied*, 393 U.S. 967, 89 S.Ct.

401, 21 L.Ed.2d 375 (1968); *DuGro Frozen Foods, Inc. v. United States*, 481 F.2d 1271, 1272 (5th Cir. 1973).

■ These considerations provide only imperfect guidance when the issue relates to a shareholder's purported loan to his own corporation, the usual situation encountered in debt-equity cases. It is well established that shareholders may loan money to their corporations and achieve corresponding tax treatment. *See United States v. Snyder Bros. Co.*, 367 F.2d 980, 983 (5th Cir. 1966), *cert. denied*, 386 U.S. 956, 87 S.Ct. 1021, 18 L.Ed.2d 104 (1967); *Rowan v. United States*, 219 F.2d 51 (5th Cir. 1955). When making such loans they could hardly be expected to ignore their shareholder status; their motivations will not match those of potential lenders who have no underlying equity interest. The "risk of the business" standard, though, continues to provide a backdrop for our analysis. While we should not expect a creditor-shareholder to evidence motivations and behavior conforming perfectly to those of a mere creditor, neither should we abandon the effort to determine whether the challenged transaction is in substance a contribution to capital masquerading as debt.[15]

■ Rather than attempt to measure concrete cases against an abstract formulation of the overriding test, we have identified numerous observable criteria that help place a given transaction on one side of the line or the other. We have always recognized, however, that the various factors are not equally significant. "The object of the inquiry is not to count factors, but to evaluate them." *Tyler v. Tomlinson*, 414 F.2d 844, 848 (5th Cir. 1969). Each case turns on its own facts; differing circumstances may bring different factors to the fore. *See In re Indian Lake Estates, Inc.*, 448 F.2d 574, 579 (5th Cir. 1971); *Tomlinson v. The 1661 Corp.*, 377 F.2d 291, 295 (5th Cir. 1967).

15. In emphasizing the usefulness of comparing the challenged transaction to the type arrangement that a disinterested lender would have entered, the Third Circuit has noted that disregarding the shareholder-lender's personal inter-

est in his own corporation is fairer than presumptively construing all such transactions adversely to the shareholder. *See Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968).

■■ With that preliminary caveat, we note the factors that prior cases have identified:

(1) the names given to the certificates evidencing the indebtedness;

(2) The presence or absence of a fixed maturity date;

(3) The source of payments;

(4) The right to enforce payment of principal and interest;

(5) participation in management flowing as a result;

(6) the status of the contribution in relation to regular corporate creditors;

(7) the intent of the parties;

(8) "thin" or adequate capitalization;

(9) identity of interest between creditor and stockholder;

(10) source of interest payments;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek a postponement.

*Estate of Mixon v. United States,* 464 F.2d 394, 402 (5th Cir. 1972).[16] As indicated above, these factors are but tools for discerning whether a transaction more closely resembles the type arrangement for which Congress provided debt or equity treatment.[17]

■ In the case at bar the most telling of the *Mixon* factors is the corporate debtors' consistent failure to repay the debts on the due dates or to seek postponements. More generally, that failure and the corresponding absence of timely interest payments combine with Walden's testimony regarding the parties' view of their relationships to make clear that these transactions were in substance not at all the type arrangements for which debt treatment is appropriate.

The individuals' failure to insist upon timely repayment or satisfactory renegotiation indicates that the compensation they sought went beyond the announced interest rate, for an investor would not ordinarily undertake such a risk for so limited a return. *See Tyler v. Tomlinson,* 414 F.2d 844, 850 (5th Cir. 1969). The failure to insist that the corporations pay the interest that the agreements provided underscores the inference; "a true lender is concerned with interest." *Curry v. United States,* 396 F.2d 630, 634 (5th Cir.), *cert. denied,* 393 U.S. 967, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968). *See also National Carbide Corp. v. Commissioner,* 336 U.S. 422, 435 n. 16, 69 S.Ct. 726, 93 L.Ed. 779 (1949). When a corporate contributor seeks no interest, it becomes abundantly clear that the compensation he seeks is that of an equity interest: a share of the profits or an increase in the value of his shareholdings. *See Estate of Mixon v. United States,* 464 F.2d 394, 409 (5th Cir. 1972).

Walden's testimony confirms these conclusions. He acknowledged that the individuals sought payments of principal or interest only when the corporations had "plenty of cash" and that the investors did so because they were more concerned with their status as shareholders than as creditors. That statement of how the individuals viewed their situation corresponds almost perfectly to the classic equity situation. A corporation normally declares dividends only when it has "plenty of cash." Shareholders ordinarily acquiesce in such dividend policies because their primary concern is the health and long-term success of the enterprise. Walden's statement indicates that the individuals here possessed precisely those motivations and that they believed it appropriate for the corporations

---

16. The list is not exhaustive; our cases undoubtedly mention considerations that have yet to take a number. Congress has recently authorized the Secretary to promulgate regulations setting forth appropriate factors. *See* I.R.C. § 385. For the time being, however, we must rely on our own pronouncements.

17. The issue is primarily one of law. We must uphold the district court's findings of basic facts unless clearly erroneous, but the ultimate characterization of the transactions as debt or equity receives no such protection. *See Estate of Mixon v. United States,* 464 F.2d 394, 402–03 (5th Cir. 1972).

to decide when to make payments on the same basis that corporations customarily make dividend decisions. *See Berkowitz v. United States*, 411 F.2d 818, 821 (5th Cir. 1969). The taxpayers' pattern of conduct belies any intention to structure their affairs as parties to a debt transaction ordinarily would. In the circumstances here, these factors indicate that all the transactions should be characterized for tax purposes as equity arrangements.

■ In reaching this conclusion we have not ignored the other factors our cases have identified. Appellants place particular reliance on the intent of the parties. Here, appellants contend, the form in which the parties cast the transactions conclusively demonstrates their intent to create a debt relationship. In relying so heavily on this factor, however, appellants misconceive its import. The question is not whether the parties intended to call their transaction "debt" and thus to achieve advantageous tax treatment; that a person wants to pay less tax rather than more provides little basis for discerning how much tax Congress decided he should pay. Instead, the relevant inquiry is the actual manner, not the form, in which the parties intended to structure their relationship. If the intended structuring accords with the type arrangement that qualifies for taxation as debt, that intent supports a finding of debt. Here, however, the parties intended to structure their relationship in a manner placing funds at the prolonged risk of the businesses; they intended decisions whether to make payments on the advances to be based on the criteria usually associated with dividend decisions. To the extent that intent is relevant, it favors equity classification.[18]

■ Another *Mixon* factor to which appellants look for support is the extent to which the advance was used to acquire capital assets. They argue that here the corporations used none of the advances for that purpose. Instead, appellants note, the corporations used the contributions primarily for land, which constitutes the inventory of these real estate development firms. Whatever force this factor might have in other settings, appellants here can garner little support from it. Most of these advances, while perhaps not used for capital assets, nonetheless served "to finance initial operations." *Plantation Patterns, Inc. v. Commissioner*, 462 F.2d 712, 722 (5th Cir. 1972). *See Aqualane Shores, Inc. v. Commissioner*, 269 F.2d 116 (5th Cir. 1959) (shareholder's credit "sale" of land to real estate development corporation held to constitute equity contribution). Providing the bulk of the necessary first assets without which a corporation could not begin functioning is as traditional a usage of capital contributions as is purchasing "capital assets."

■ Another factor from *Mixon* that sometimes proves most instructive is the identity of interest between creditor and stockholder. Courts and commentators have often discussed this criterion under the rubric "proportionality." When each shareholder owns the same proportion of the company's stock as he does of the ostensible shareholder debt, the parties' framing of the transaction contributes little to the analysis. *See Fin Hay Realty Co. v. United States*, 398 F.2d 694 (3d Cir. 1968). In that situation the owners' decision regarding how much of their contribution to cast as equity and how much as debt does not affect the distribution of control over the company. Non-tax considerations may play little role in the choice, and reviewing courts accordingly must scrutinize carefully the resulting transaction. When, on the other hand, an individual holds different percentages of the corporation's stock and shareholder debt, the casting of debt in that

18. Walden testified that the corporations intended to repay the indebtedness. Even accepting that testimony as true, the parties' conduct makes clear that they intended to repay only after a prolonged period, at which time repayment would be likely only if the enterprises had proved successful. Thus they intended to repay in the same sense that corporations might intend their dividends eventually to total up to the original price of the stock. Walden's testimony in this regard provides only the barest support for debt classification.

form ordinarily will affect substantial non-tax interests. There is thus reason to believe that the parties' debt characterization has substance as well as form.[19]

 Appellants argue in the case at bar that many of the challenged transfers exhibited imperfect proportionality and that some displayed none at all.[20] While that argument would carry weight in the usual case, it has little force here. The disproportional holdings all occurred among close relatives. Although we do not treat the various shareholding members of the J. T. Haley family as an indivisible unit, neither do we treat them as unrelated individuals. For all that appears in this record, relations among the various family members were completely harmonious. Because shareholding family members were thus less likely to attribute major significance to departures from strict equality in their positions, the instances of disproportionate debt and equity holdings provide a much weaker inference than they ordinarily would that the ostensible debt was in fact what it purported to be.[21]

 Finally, appellants strenuously urge that the level of the corporations' capitalization does not undermine their position. We have not, however, based our decision on the inadequacy of the corporate capitalization. While some of the purported loans were made to corporations with woefully inadequate capital, others were not. In some cases, as the taxpayers note, capitalization was adequate.[22] These facts

19. Even when a corporation incurs bona fide debt, of course, the opportunity to advance the funds and earn the corresponding return provides both tax and other advantages to the shareholder. Individual shareholders may therefore insist upon receiving their share of such advantages. Thus "proportionality" justifies courts in applying careful examination of the transactions but is not necessarily inconsistent with a finding of bona fide debt.

20. Transfers B, C, H and L exhibited perfect proportionality; each shareholder took the same percentage of shareholder debt as he or she held of the corporation's stock. Transfers D and E originally showed complete proportionality but became somewhat disproportional when the corporations made principal payments in different amounts to the different shareholders. Transfer F was not completely proportional; Katherine's children made loans but held no shares. Treating Katherine and her children as a unit, however, transfer F exhibited perfect proportionality. Similarly, transfer K evidenced no proportionality but was totally proportional treating Cornelia and her children as a unit. Transfer J was only roughly proportional. While different shareholders (or their businesses) made advances at different times, each of the three equal shareholders put up roughly one-third of the funds when considered in conjunction with their other loans to the corporation. Transfer G was not proportional; a one-third shareholder made the entire advance. Transfer A was completely disproportional; Spencer made the loan but held no stock.

21. In *Estate of Mixon v. United States,* 464 F.2d 394 (5th Cir. 1972), we examined proportionality by looking to the family attribution provisions of I.R.C. § 318. *See* 464 F.2d at 398

n. 3, 409. Even using those provisions to increase the individual's shareholdings, he held only 15.3% of the corporation's stock while making 80% of the challenged advance. Thus taking the view of attribution most favorable to the government in that case, the low proportionality favored the taxpayer.

In the case at bar, unlike in *Mixon,* the approach taken to attribution affects the direction in which the proportionality factor cuts. We think the proper approach is the practical one outlined in the text. Rather than rigidly apply the § 318 attribution rules—an approach that *Mixon* does not require and that would contravene the limitation of that section to "those provisions . . . to which [it is] expressly made applicable," I.R.C. § 318(a)—we treat the familial relationships as factors affecting the impact to be accorded the results of the proportionality inquiry. We of course accord careful scrutiny to intra-family transactions. *See Dillin v. United States,* 433 F.2d 1097, 1103 (5th Cir. 1970).

22. Taxpayers urge that these businesses involved little risk and therefore needed little capital. The apparent failure of Forest Estates, however, belies their assertion. The ventures incurred development expenses running into six figures and required as much as two or three years to begin receiving any revenues by selling lots. These considerations demonstrate the inadequacy of, for example, the initial capitalizations of $5,100 for Cairo Developers, $9,000 for Slappey, and $21,000 for Sherwood. Thus the capitalization factor favors the government with respect to transfers made to those corporations upon their formation.

In regard to transfers made at later times, however, we agree with appellants that net worth, not initial capitalization, provides the

strengthen our conclusion as to some transactions, weaken it for others. They do not, however, suffice to change the conclusion we have derived from the parties' pattern of conduct and from Walden's testimony.[23]

▆ Because the parties to the transactions in question intended to conduct and did conduct their affairs in a manner that the tax code labels equity rather than debt, taxation of the transactions as equity is appropriate. Contrary to appellants' assertions, in reaching that result we do not disapprove their decisions concerning how to organize the corporations, and we do not substitute our business judgment for theirs. We merely announce the tax consequences that attach to their decisions. While appellants are correct that they were free to decide without our supervision how much of the corporate financing to derive from loans and how much from capital contributions, they were not free to decide for themselves what tax consequences would attach to their conduct.

III. Surtax Exemption

▆ Corporations pay a different rate of tax on income above and below a set amount. The Internal Revenue Code accomplishes this result by computing corporate income taxes as the sum of the "normal tax" and the "surtax." *See* I.R.C. § 11. A corporation is ordinarily exempt from surtax on taxable income below a set amount. *Id.* Here, however, the Commis-

sioner rejected the surtax exemption claims of Sherwood and Additions, contending that those corporations were formed principally for the purpose of avoiding income taxes. I.R.C. § 269 provides for the disallowance of deductions, credits or other allowances in certain circumstances where the principal purpose of the underlying transaction was tax avoidance. The district court upheld the Commissioner, finding as a fact that tax avoidance had indeed been the taxpayers' primary motivation.

On appeal taxpayers acknowledge that § 269 provides a tool for attacking surtax exemptions. *See, e. g., Bobsee Corp. v. United States,* 411 F.2d 231 (5th Cir. 1969), *Green Light Co. v. United States,* 405 F.2d 1068 (5th Cir. 1968); *Airport Grove Corp. v. United States,* 431 F.2d 739 (5th Cir. 1970). While abandoning their claim in regard to Sherwood, taxpayers continue to maintain that they formed Additions primarily for non-tax-avoidance purposes.

We set forth the applicable standards in *Bobsee Corp., supra.* "[T]here are only two relevant classes of purposes: tax-avoidance and non-tax-avoidance; the statute applies only if the former class exceeds the latter." *Id.,* 411 F.2d at 239 (footnote omitted). Which class of purposes predominates is a question of fact; we review the district court's findings only to determine whether they are clearly erroneous. *See, e. g., Your Host, Inc. v. Commissioner,* 489 F.2d 957 (2d Cir. 1973), *cert. denied,* 419 U.S. 829, 95 S.Ct. 51, 42 L.Ed.2d 54 (1974).

relevant data. *See Tomlinson v. The 1661 Corp.,* 377 F.2d 291, 299 n. 18 (5th Cir. 1967). At the time of transfer E. Sherwood's net worth was $117,000. That figure would become much greater if we were to take into account the appreciated value of Sherwood's real estate holdings or if we added the amounts of the earlier purported debts (originating from transfers C and D) that we reclassify as equity. We need not decide the propriety of these steps, for we agree with appellants that in any event Sherwood's capitalization at the time of transfer E was adequate.

23. The *Mixon* factors not discussed in text carry little weight in this case. The source of principal and interest payments and the questionable availability of similar loans from outside lenders provide slight support to the government. That most of the obligations pos-

sessed fixed maturity dates would favor appellants had they not consistently ignored those dates. Similarly, the individuals' legal right to enforce payment does not aid appellants in light of the apparent understanding, as manifested in observable behavior, that they would not enforce those rights. The lenders already controlled corporate management; that they derived no more control as a result of the ostensible loans does not cut against the equity classification. *See Dillin v. United States,* 433 F.2d 1097, 1101 (5th Cir. 1970). Finally, that appellants did not subordinate their loans to other corporate obligations, *see* note 11 *supra,* provides slight support for appellants but does not undermine the conclusion we have drawn from the more significant indicia discussed in text.

The original equal shareholders of both Lake Park and Sherwood were Cornelia Haley Walden, Loretta Haley and Joel T. Haley, Jr. They formed Lake Park in 1950 and Sherwood in 1954. Joel died in 1955, leaving equal shares of his interest in each corporation to his wife Katherine and his two children.

Cornelia, Loretta and Katherine formed Additions in 1959 to develop a residential subdivision adjoining Lake Park. Each took a one-third interest. Katherine's two children, who had become one-ninth owners of Lake Park and Sherwood by virtue of their father's death, took no shares in the new corporation. In asserting that tax avoidance was not the primary purpose for forming Additions, taxpayers emphasize that Katherine S. Haley desired to exclude her minor children from the new enterprise.

The record contains ample indicators, however, from which the trier of facts could reasonably have concluded that tax purposes predominated. In his deposition testimony Spencer Walden, who was concededly the moving force behind the multi-corporate operations and who apparently made the decision to create the new corporation, listed several reasons for forming Additions and assigned no prominence to the participation of Katherine's children. Walden alluded to the difficulty of getting a valid deed from a minor in Georgia, to the need for separate corporations to market houses of "different character," to the advantages of limited liability, to the ease with which divisions or trades of shareholdings could be made under a multicorporate arrangement, and to the interest in having one corporation for houses north of the highway and another for those south of the highway. Walden did not explain how these vague contentions, many of which are palpably trivial, related to the decision whether to create a new corporation. Their relationship is at best very weak.

Walden acknowledged that he made the decision on the advice of his accountant and tax adviser, T. S. Mauldin. Mauldin conceded that they discussed the surtax exemptions as an advantage of having multiple corporations. Walden denied that surtax exemptions provided the sole reason for the decision, but tax avoidance need not be the sole purpose of a transaction in order to bring § 269 into play. In response to Walden's unfocused laundry list of non-tax considerations sounding much like after-the-fact rationalizations, the district court concluded that tax purposes predominated. That finding is not clearly erroneous, and we therefore uphold it.[24]

## IV. Capital Gains/Ordinary Income

 Sherwood and Additions seek capital gains treatment on sales of several small tracts for non-residential purposes. Such treatment would be appropriate only if the property constituted a "capital asset." The Internal Revenue Code defines that term as "property held by the taxpayer" but excludes numerous items from that definition. *See* I.R.C. § 1221. Among the exclusions is "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." I.R.C. § 1221(1). As used in that section, "primarily" means "of first importance" or "principally." *See Malat v. Riddell*, 383 U.S. 569, 572, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); *Biedenharn Realty Co. v. United States*, 526 F.2d 409, 422 (5th Cir.) (en banc), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). The district court concluded that the land involved here came within § 1221(1) and that ordinary income treatment therefore was appropriate. We agree.

 In *Biedenharn, supra,* our en banc court set forth the proper approach for determining whether land has been held for sale or for investment.[25] We adhered to the

24. Taxpayers note that the district court's opinion did not mention the alleged desire to exclude the children from Additions. The court, however, did quote one of several passages where the principals provided evasive answers

on the surtax issue, and we find no indication that the district court ignored any evidence.

25. In *Biedenharn* we also canvassed our prior decisions and the other relevant authorities.

factors enumerated in *United States v. Winthrop,* 417 F.2d 905, 910 (5th Cir. 1969): the "substantiality and frequency of sales, improvements, solicitation and advertising efforts, and brokers' activities." *Biedenharn, supra,* 526 F.2d at 415.[26]

In the case at bar the result that these factors counsel depends upon the success of taxpayers' efforts to have us view the three small lots in question in isolation from the larger tracts of which they were originally a part.[27] Sherwood began its first subdivision with over 60 acres that it divided into 180 residential lots, leaving .99 acres it sold to Texaco and 2.72 acres it conveyed to a church. Sherwood of course acknowledges that it held the 180 lots primarily for sale to customers in the ordinary course of its business. In regard to those 180 lots, and the numerous others derived from the additional 210 acres Sherwood had obtained for residential developments prior to the challenged sale to Texaco, Sherwood made substantial and frequent sales, undertook major and ongoing improvements, and solicited purchasers. If the Texaco parcel is viewed in isolation, on the other hand, Sherwood completed only a single sale, added no improvements, and did not seek out a purchaser.[28]

The Additions sales present a similar issue. Its founders organized the corporation to develop a 268.8 acre tract that yielded hundreds of residential lots. Sales were frequent, improvements substantial, and solicitations undenied. With respect to the two acres sold to Georgia Power and the fraction of an acre sold to the city, however, sales were two, improvements and solicitations none.[29]

We decline the taxpayers' invitation to blind ourselves to their predominating activities and to narrow our focus to three carefully excised slivers from the land they sought to develop. The corporations undoubtedly acquired the lots intending to incorporate them into their projects and to sell them in the ordinary course of business; when these real estate firms decided not to do so, they found alternative buyers within a relatively short period.[30]

Under these circumstances the *Biedenharn* analysis and *Winthrop* factors require ordinary income treatment. A business of this type bears a heavy burden in attempting to separate for special treatment a small fragment of a tract bought for development and sale.[31] This record contains no

We do not attempt to reiterate here the analysis set forth there.

**26.** More fully, we announced in *Winthrop* and quoted in *Biedenharn* the following enumeration of factors:

(1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of 'supervision, or control exercised by the taxpayer over any representative selling the property; and (7) the time and effect the taxpayer habitually devoted to the sales. *Biedenharn,* 526 F.2d at 415 n. 22, *quoting Winthrop,* 417 F.2d at 910. The ordination indicates no hierarchy of importance. *Id.*

**27.** The ultimate issue whether the land was held for sale is one of law. Our review is not limited by the clearly erroneous standard. *See e. g., Biedenharn, supra,* 526 F.2d at 416 n.25.

**28.** The district court did not enter a finding of fact accepting Walden's deposition testimony that Texaco, not Sherwood, had initiated the transaction. This factual issue does not affect the outcome of the case, and for purposes of argument we accept Walden's testimony.

**29.** Again, we assume without a finding of fact that Additions did not solicit these sales. *See* note 28 *supra.*

**30.** Additions included the parcels in its subdivision plans but eliminated them upon learning of drainage problems. The corporation sold them within four years of this discovery. Sherwood also acquired the Texaco plot intending to use it in the development, according to a district court finding that is not clearly erroneous. Sherwood sold that parcel within eleven years of its acquisition and within some lesser period of its decision to exclude the parcel from the major development.

**31.** In *Biedenharn* we rejected the government's argument that prior investment intent was never relevant. *See* 526 F.2d at 421–22. Here we confront prior ordinary sales intent. That in-

indication that these taxpayers had completely severed the contested lots and abandoned their intent to sell them to customers. In view of the purpose for which even the fragments were purchased and the timing of their sales, taxpayers here have not met their burden. We therefore consider the questioned sales in conjunction with the larger acreage. The clear result, as taxpayers would presumably acknowledge given this conclusion, is taxation as ordinary income.

## CONCLUSION

The district court properly characterized the eleven purported corporate debts as contributions to capital. That court's conclusion that appellants formed Additions primarily for tax-avoidance purposes is not clearly erroneous. Its decision that Additions and Sherwood held three contested parcels of land for sale in the ordinary course is correct. The district court's decision is

AFFIRMED.

## APPENDIX

TRANSFER A: Pecan Haven, Inc.

On July 26, 1960, the corporation gave its note for $65,000 at 3% with installments of $12,500 due July 26·of each year from 1961 through 1964 and the final payment of $15,000 due July 26, 1965. The corporation has made the following payments.

| Date | Principal Payment | Interest Payment | Remaining Balance |
|---|---|---|---|
| 9/1/61 | 12,500.00 | 1,950.00 | 52,500.00 |
| 6/8/62 | 12,500.00 | 1,575.00 | 40,000.00 |
| 9/22/64 | | 2,606.64 | 40,000.00 |

On September 22, 1964, the corporation refinanced the $40,000 balance. It issued four new $10,000 notes at 3%, one due on September 21 of each year from 1965 through 1968.

| Date | Principal Payment | Interest Payment | Remaining Balance |
|---|---|---|---|
| 9/15/70 | | 1,200.00 | 40,000.00 |
| 10/5/70 | 10,000.00 | 1,503.45 | 30,000.00 |
| 11/16/71 | | 3,600.00 | 30,000.00 |
| 2/17/72 | 10,000.00 | 491.50 | 20,000.00 |

tent with respect to the fragments is clearly relevant in deciding whether the contested lots should be viewed in isolation from the overall tracts.

TRANSFER B: Lake Park, Inc.

On September 7, 1954, the corporation gave its demand note for $40,000 at 4%. The corporation has made the following payments.

| Date | Principal Payment | Interest Payment | Remaining Balance |
|------|-------------------|------------------|-------------------|
| 12/31/55 | 1,802.17 | | 38,197.83 |
| 6/27/56 | | 2,500.00 | 38,197.83 |
| 4/3/57 | 1,000.00 | | 37,197.83 |
| 4/15/57 | 1,500.00 | | 35,697.83 |
| 5/24/57 | 4,750.00 | | 30,947.83 |
| 5/31/58 | 10,000.00 | | 20,947.83 |
| 12/9/58 | 947.83 | | 20,000.00 |
| 1/31/59 | 20,000.00 | | -0- |

TRANSFER C: Sherwood Acres, Inc.

On September 7, 1954, the corporation gave its demand note for $18,000 at 4%. The corporation has made the following payments.

| Date | Principal Payment | Interest Payment | Remaining Balance |
|------|-------------------|------------------|-------------------|
| 6/7/56 | 2,500.00 | | 15,500.00 |
| 5/31/59 | 2,407.70 | | 13,092.30 |
| 6/4/59 | 3,725.00 | | 9,367.30 |
| 6/30/60 | 9,367.30 | | -0- |
| unknown | | 2,391.87 | -0- |

**590**

TRANSFER D: Sherwood Acres, Inc.

The corporation gave its five-year notes for $189,720.02 at 3% due January 2, 1965. The corporation has made the following payments.

| Date | Principal Payment | Interest Payment | Remaining Balance |
|---|---|---|---|
| 10/15/62 | | 15,177.60 | 189,720.02 |
| 3/16/64 | 16,740.00 | 8,742.94 | 172,980.02 |
| 8/10/64 | 26,980.02 | | 146,000.00 |
| 8/31/64 | | 2,176.69 | 146,000.00 |
| 12/10/64 | 38,000.00 | 380.00 | 108,000.00 |
| 10/27/65 | | 515.44 | 108,000.00 |
| 11/10/65 | | 1,030.88 | 108,000.00 |
| 4/12/67 | 32,000.00 | 8,640.00 | 76,000.00 |
| 6/16/67 | 17,600.00 | 374.00 | 58,400.00 |
| 9/16/67 | | 408.34 | 58,400.00 |
| 9/29/67 | 14,400.00 | | 44,000.00 |
| 1/26/68 | 12,000.00 | | 32,000.00 |
| 9/17/68 | | 5,340.30 | 32,000.00 |
| 10/29/69 | | 960.00 | 32,000.00 |
| 11/9/70 | | 960.00 | 32,000.00 |
| 8/25/71 | | 960.00 | 32,000.00 |

TRANSFER E: Sherwood Acres, Inc.

On December 21, 1964, the corporation gave its five-year notes for $126,000.00 at 5%. The corporation has made the following payments.

| Date | Principal Payment | Interest Payment | Remaining Balance |
|---|---|---|---|
| 9/14/65 | 42,000.00 | | 84,000.00 |
| 11/10/65 | | 1,458.33 | 84,000.00 |
| 9/19/67 | | 11,320.00 | 84,000.00 |
| 9/17/68 | | 4,200.00 | 84,000.00 |
| 10/27/69 | | 4,200.00 | 84,000.00 |
| 11/9/70 | | 4,200.00 | 84,000.00 |
| 8/25/71 | | 4,200.00 | 84,000.00 |

TRANSFER F: Lake Park Additions, Inc.

On September 8, 1958 and July 22, 1959, the corporation gave its five-year notes totalling $368,200.00 at 3%.[1] The corporation has made the following payments.

| Date | Principal Payment | Interest Payment | Remaining Balance |
|------|------|------|------|
| 7/15/64 | | 22,091.40 | 368,200.00 |
| 3/30/65 | | 40,837.59 | 368,200.00 |
| 6/7/65 | | 1,846.30 | 368,200.00 |
| ?/?/65 | 5,000.00 | | 363,200.00 |
| 7/7/66 | | 44,914.87 | 363,200.00 |
| 6/16/67 | | 29,055.92 | 363,200.00 |
| 7/22/68 | | 29,056.00 | 363,200.00 |
| 7/17/69 | | 29,056.00 | 363,200.00 |

TRANSFER G: Lake Park Additions, Inc.

On August 2, 1961, the corporation gave its one-year note for $61,250.00 at 5%. The corporation has made the following payments.

| Date | Principal Payment | Interest Payment | Remaining Balance |
|------|------|------|------|
| 8/10/64 | 16,250.00 | 9,187.50 | 45,000.00 |
| 3/30/65 | 15,000.00 | 1,506.25 | 30,000.00 |
| 6/7/65 | | 254.17 | 30,000.00 |
| 9/10/65 | 30,000.00 | 420.83 | -0- |

1. The notes issued in 1958 totalled $245,467.00. The notes issued in 1959 totalled $122,733.00.

TRANSFER H: Forest Estates, Inc.

On September 5, 1959, the corporation gave its five-year notes for $100,000.00 at 4%. The corporation has made the following payments.

| Date | Principal Payment | Interest Payment | Remaining Balance |
|------|-------------------|------------------|-------------------|
| 12/14/61 | | 74.04 | 100,000.00 |
| 12/19/62 | | 98.19 | 100,000.00 |
| 12/19/63 | | 160.43 | 100,000.00 |
| 12/18/64 | | 721.16 | 100,000.00 |
| 3/17/65 | | 3,000.00 [2] | 100,000.00 |
| 9/24/65 | | 10,000.00 | 100,000.00 |
| 12/1/65 | | 777.37 | 100,000.00 |
| 12/14/66 | | 847.29 | 100,000.00 |
| 10/1/67 | | 900.00 | 100,000.00 |
| 12/21/67 | | 692.00 | 100,000.00 |
| 12/22/67 | | 691.99 | 100,000.00 |
| 12/18/67 | | 698.42 | 100,000.00 |
| 8/16/71 | 30,000.00 | | 70,000.00 |

TRANSFER J: Cairo Developers, Inc.

The corporation gave its notes as follows.

| Payee | Date | Amount | Due Date | Interest Rate |
|-------|------|--------|----------|---------------|
| Walden & Kirkland | 5/12/61 | 4,600.00 | 5/12/62 | 6% |
| Walden & Kirkland individually | 7//7/61 | 2,250.00 | 7/17/62 | 6% |
| Walden & Kirkland | 11/15/61 | 2,500.00 | on demand | 5% |
| Walden & Kirkland | 1/4/62 | 2,000.00 | 1/4/63 | 8% |
| Walden & Kirkland | 2/8/62 | 7,000.00 | 2/8/63 | 6% |
| Walden & Kirkland Realtors, Inc. | 5/17/62 | 3,000.00 | 5/17/63 | 6%. |
| Walden & Kirkland Realtors, Inc. | 6/15/62 | 7,100.00 | 6/15/63 | 6% |
| Clark | 2/20/62 | 1,500.00 | on demand | 6% |
| Walden & Kirkland individually | 12/29/62 | 4,000.00 | on demand | 6% |

2. The corporation's books originally reflected the September 24, 1965 payment of $10,000 as principal. At some point a correcting entry changed the characterization to interest.

| | | | | |
|---|---|---|---|---|
| Walden, Kirland and Clark individually | 3/21/63 | 6,450.00 | on demand | 5% |
| Kirkland, Clark and Walden's children | 1/8/64 | 9,000.00 | 1/8/65 | 6% |
| | | 49,400.00 | | |

The corporation has made the following payments.

| Date | Principal Payment | Interest Payment | Remaining Balance |
|---|---|---|---|
| 7/29/71 | 10,000.00 | 335.41 | 39,400.00 |
| 9/1/71 | 6,850.00 | 313.47 | 32,550.00 |
| 1/13/72 | 6,650.00 | 1,805.00 | 25,900.00 |
| 2/4/72 | 12,100.00 | 63.64 | 13,800.00 |

TRANSFER K: Slappey Drive Industrial Park, Inc.

On July 10, 1962, the corporation gave its eight-year note for $75,000.00 at 4%. The corporation has made the following payments.

| Date | Principal Payment | Interest Payment | Remaining Balance |
|---|---|---|---|
| 7/22/65 | | 4,500.00 | 75,000.00 |
| 8/31/65 | 25,000.00 | 4,941.67 | 50,000.00 |
| 6/21/66 | 3,000.00 | 1,633.33 | 47,000.00 |
| 9/15/66 | 15,000.00 | 287.18 | 32,000.00 |
| 8/7/68 | | 2,293.27 | 32,000.00 |
| 6/30/69 | | 1,280.00 | 32,000.00 |
| 6/30/70 | | 1,280.00 | 32,000.00 |
| 6/30/71 | | 1,280.00 | 32,000.00 |

TRANSFER L: Slappey Drive Industrial Park, Inc.

On May 27, 1963, the corporation gave its one-year notes for $15,000.00. The corporation made no payments of principal or interest.