T.C. Memo. 1997-52


UNITED STATES TAX COURT


NORTON M. BOWMAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6078-95.                    Filed January 28, 1997.


<u>Herman C. Daniel III</u>, for petitioner.

<u>Deborah C. Stanley</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


WELLS, <u>Judge</u>:  Respondent determined a deficiency of $37,684 in petitioner's 1988 Federal income tax.  The issues we must decide are:  (1) Whether a distribution received by petitioner

during 1988 constituted a repayment of a loan or a dividend and (2) the amount received by petitioner.[1]

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91.[2] The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case.

At the time the petition was filed in the instant case, petitioner resided in Richmond, Virginia.

Norton M. Bowman and Associates, Inc. (Associates) was organized pursuant to Virginia law during the late 1970's. During all relevant times, petitioner controlled Associates as its president, chief executive officer, and sole stockholder. Associates engaged in the business of constructing single-family homes in the Richmond area. From the time of its organization until 1981, Associates constructed 15 to 18 houses. The profits earned from the sale of those houses were used to meet the escalating costs of subsequent jobs and were not distributed. Prior to the time of the distribution in issue, which occurred on

---

[1] Petitioner alleged in his petition that the period of limitations for assessment and collection of his 1988 income tax had run by the time the notice of deficiency in the instant case was issued. Petitioner made no argument on brief concerning that allegation, and we consider it abandoned. Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

[2] Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code as in effect for the year in issue.

March 24, 1988, petitioner received no salary or dividends from Associates.

Soon after its organization, Associates obtained from United Virginia Bank (bank), later known as Crestar Bank, a $150,000 line of credit that funded Associates' operations. The line was secured by three certificates of deposit, two of which, in the aggregate amount of $130,000, were in the name of petitioner, and one of which, in the amount of $20,000, was in the name of petitioner's wife. During January 1981, the bank called the line, and the certificates of deposit in petitioner's name were redeemed during that month and used to satisfy the indebtedness (sometimes hereafter referred to as the 1981 transaction). The amount of those certificates exceeded Associates' indebtedness to the bank by a few thousand dollars, and petitioner retained that excess. The certificate in the name of petitioner's wife was not used to pay Associates' debt. Associates did not obtain another line of credit. At that time, petitioner did not desire to continue building houses because the housing market was not strong and interest rates were between 18 and 19 percent.

Petitioner's attorney drew up an unsecured demand note (note) that bore no interest. The note was made on those terms because petitioner did not know when improved business conditions would enable Associates to resume operations. The note was among items that were subsequently lost in a flood. Associates' assets at the time that the note was drawn up included building lots and

a model home that was used to demonstrate the features that could be incorporated in the homes it constructed. Associates also owed $40,000 to trade creditors with respect to a house under construction. Associates' assets were otherwise unencumbered at relevant times. Associates' income tax return for its fiscal year ended September 30, 1981 (1980 corporate return), reported that debts due its officers increased from $3,006.86 for the year ended September 30, 1980, to $126,008.16 for the year ended September 30, 1981.

During 1982 and 1983, petitioner devoted his time to a travel business rather than to the building business, but by 1985 the housing market had revived sufficiently to cause petitioner to resume Associates' business of building houses. On March 24, 1988, Associates paid petitioner $117,164.91 of its funds, which were deposited into an investment savings account in petitioner's name (hereinafter sometimes referred to as the 1988 distribution). The distribution represented the proceeds of a closing on a house sold by Associates. The distribution was made because Associates was doing well and did not need the money. Petitioner considered that the amount of the distribution approximated the amount he thought was due him from Associates. The funds were pledged as collateral for a line of credit in favor of Associates. Petitioner did not report the distribution as income on his 1988 income tax return because he considered it the repayment of a debt owed him by Associates.

Associates' income tax return for the year ended September 30, 1988 (1987 corporate return), reported that its indebtedness to shareholders decreased by $125,000 during that year.

OPINION

The principal issue presented for decision in the instant case is whether the distribution[3] petitioner received from Associates during 1988 was a loan repayment or a dividend. If we decide that the distribution was a dividend, and therefore taxable income, the question of the amount received must also be decided.

In order to ascertain the nature of the 1988 distribution, we must decide whether, based on reliable indicia of the intrinsic economic nature of the transaction, there was a genuine intention that the 1981 transaction create a debtor-creditor relationship between Associates and petitioner. Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 (5th Cir. 1974); Road Materials, Inc. v. Commissioner, 407 F.2d 1121, 1124-1125 (4th Cir. 1969), affg. on this issue T.C. Memo. 1967-187; Kohler-Campbell Corp. v. United States, 298 F.2d 911, 913 (4th Cir. 1962); Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 378

---

[3]  As discussed below, we consider petitioner to have received only one distribution from Associates during 1988.

(1973).  If the 1981 transaction was a bona fide loan by petitioner to Associates, the 1988 distribution is a repayment of the loan, but if the 1981 transaction was a contribution to Associates' capital, the 1988 distribution is a dividend.  The inquiry into whether the 1981 transaction resulted in a loan to Associates or a contribution to its capital is one of fact.  Road Materials, Inc. v. Commissioner, supra at 1124; Segel v. Commissioner, 89 T.C. 816, 827 (1987).

Because there is no controlling statute or regulation defining the difference between corporate debt and equity, we are left to decide the question based on a series of factors that courts have relied upon in distinguishing between the two.  Segel v. Commissioner, supra at 826-827.  Those factors include:  (1) the names given the certificates evidencing the purported indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of repayments; (4) right to enforce payments; (5) participation in management as a result of advances; (6) the status of the persons advancing funds in relation to regular corporate creditors; (7) the intent of the parties; (8) identity of interest between stockholder and purported creditor; (9) the "thinness" of capital structure in relation to debt; (10) the ability of the corporation to obtain credit from outside sources; (11) the use to which the advances were put; (12) the failure of the purported debtor to repay; and

(13) the risk involved in making the advances.  <u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. 476, 493 (1980).

No single factor is controlling, nor is each equally significant, or even relevant, in the circumstances of a particular case.  <u>Id.</u> at 493-494.  Our task is not to count factors, but to evaluate them.  <u>Slappey Drive Ind. Park v. United States</u>, 561 F.2d 572, 581 (5th Cir. 1977).  "Each case turns on its own facts; differing circumstances may bring different factors to the fore."  <u>Id.</u>  The 1981 transaction must be measured by objective tests of economic reality, and the touchstone of economic reality is whether an outside lender would have made a loan to Associates in the same form and on the same terms as the 1981 transaction.  <u>Segel v. Commissioner</u>, <u>supra</u> at 828.

The entire record must be considered, especially where, as here, the person in control of the nominal debtor is also the nominal creditor, and the arm's-length dealing that characterizes the money market is absent.  <u>Road Materials, Inc. v. Commissioner</u>, <u>supra</u> at 1124.  In distinguishing between loans to a corporation and contributions to its capital, courts have noted that a creditor avoids subjecting funds advanced to the risk of the business insofar as possible and seeks a reliable return, while a shareholder places an investment at that risk and obtains a return from the business' success.  <u>Slappey Drive Indus. Park v. United States</u>, <u>supra</u> at 581; <u>Jewell Ridge Coal Corp. v.</u>

<u>Commissioner</u>, 318 F.2d 695, 698 (4th Cir. 1963), affg. T.C. Memo. 1962-194.

We have considered all of the factors set forth above, as well as all of the circumstances revealed by the record, and discuss below those we find most pertinent. We note first that the 1981 transaction was cast in the form of a loan. Petitioner points out that the note was prepared as evidence of Associates' obligation to repay petitioner, although the note was not produced at trial due to its loss in a flood. Associates' books were not introduced in evidence; however, its relevant tax returns report an increase and decrease in its indebtedness that may reflect the 1981 transaction and 1988 distribution. Petitioner also testified that he made a "loan" to Associates during 1981 that was "repaid" during 1988.

The existence of a debt, however, does not necessarily follow. <u>Road Materials, Inc. v. Commissioner</u>, <u>supra</u> at 1124. The law requires more than "a declaration of intention to create an indebtedness and more than the existence of corporate paper encrusted with the appropriate nomenclatural captions." <u>Tyler v. Tomlinson</u>, 414 F.2d 844, 850 (5th Cir. 1969). The 1981 transaction will not be treated as a debt for Federal tax purposes merely because it is evidenced in a manner that Virginia law recognizes as debt.[4] <u>Road Materials, Inc. v. Commissioner</u>,

---

[4] It is also not conclusive that, by paying off the credit
                                                    (continued...)

supra at 1124.  Furthermore, when a transaction involves a closely held corporation, the form and labels assigned to the transaction may not have much significance because the parties can mold the transaction to their will.  Anchor Natl. Life Ins. Co. v. Commissioner, 93 T.C. 382, 407 (1989).  It is the substance of the transaction, rather than the form, that controls for tax purposes.  Road Materials, Inc. v. Commissioner, supra at 1124.

Circumstances other than the form of the loan indicate that the substance of the 1981 transaction did not accord with its form.  The note was payable on demand and did not have a fixed maturity date because, as petitioner explained, he was unsure when business conditions would enable Associates to resume operations.  The absence of a fixed maturity date indicates that repayment was tied to the fortunes of the business, which suggests that the 1981 transaction effected a contribution to Associates' capital.  In re Lane, 742 F.2d 1311, 1316 (11th Cir.

--------

4  (...continued)
line, petitioner may have stepped into the shoes of the bank as Associates' creditor pursuant to the equitable doctrine of subrogation.  The question whether the 1981 transaction was a loan or effected a contribution to Associates' capital must be resolved based on whether or not, considering all of the circumstances in the record, petitioner intended to create a debtor-creditor relationship between Associates and himself.  In re Lane, 742 F.2d 1311, 1319-1320 (11th Cir. 1984); Santa Anita Consol., Inc. v. Commissioner, 50 T.C. 536, 550 (1968); Kavich v. United States, 507 F. Supp. 1339, 1342 n.2 (D. Neb. 1981). Petitioner admits as much on brief.  Moreover, petitioner cannot use the doctrine to appropriate for himself the bank's status as a bona fide creditor of Associates.

1984); Estate of Mixon v. United States, 464 F.2d 394, 404 (5th Cir. 1972); American Offshore, Inc. v. Commissioner, 97 T.C. 579, 602 (1991).

Moreover, the 1981 transaction occurred when Associates was suspending business activities due to weakness in the market for new homes. Petitioner indicated in his testimony that he did not intend to make a demand for payment and expected that he would be paid when market conditions improved. However, the record does not suggest when that improvement might occur. In fact, Associates did not resume operations until 1985, and petitioner testified that he did not receive a distribution from Associates until 1988. The foregoing circumstances indicate that there was no reasonable expectation that "repayment" of petitioner's "loan" would occur within a short time. Accordingly, the absence of a fixed maturity date given Associates' business prospects indicates that the 1981 transaction was in the nature of a contribution to its capital. In re Lane, supra at 1316.

Petitioner contends that Associates had sufficient assets to "repay" his "loan" both at the time that it was made and subsequently, indicating that Associates was adequately capitalized and that a reasonable expectation of repayment existed. Assuming arguendo that Associates' assets were sufficient for that purpose, it is reasonable to conclude that a demand for payment would have stripped Associates of assets needed to carry on its business, such as the model home which it

used to demonstrate the features that could be built into the houses it constructed for its customers or the building lots on which those homes would be erected. Associates appeared not to have expendable assets that could have been used to pay petitioner without detriment to its business; rather, any assets used to pay petitioner apparently would have had to have been replaced if Associates were to continue in business. The absence of liquid assets or of reasonably anticipated cash-flow out of which to make repayments indicates that the 1981 transaction was a contribution to capital rather than a loan. Segel v. Commissioner, 89 T.C. at 830-831. Moreover, petitioner's testimony indicates that he did not intend to demand payment until business conditions for Associates improved and its assets could be sold at full value. Petitioner's position as sole shareholder of Associates, his concern for its welfare, and the consequences of a demand for repayment indicate that it was unlikely that such a demand would be made, and thus the circumstances pointed to by petitioner do not indicate a creditor's interest in repayment. Tyler v. Tomlinson, supra at 849; Dixie Dairies Corp. v. Commissioner, 74 T.C. at 495. The fact that petitioner left the funds at the risk of Associates' business suggests that he did not intend to demand payment to the detriment of that business.

Petitioner did not obtain a security interest in any of Associates' assets in connection with the 1981 transaction.

Petitioner testified that he was Associates' sole stockholder and that his control of the corporation was such that he could have caused it to make a distribution "repaying" his "loan" at any time.  We conclude from petitioner's testimony that he relied on his control of Associates as a stockholder to protect his interests, rather than his status as a creditor, which indicates that the 1981 transaction effected a contribution to Associates' capital.  Charter Wire, Inc. v. United States, 309 F.2d 878, 881 (7th Cir. 1962).

Additionally, the note did not provide for payment of interest with respect to petitioner's "loan", even though, at the time of the 1981 transaction, interest rates ranged between 18 and 19 percent, nor does the record suggest that a payment of interest ever occurred.  Petitioner's apparent indifference to the receipt of interest suggests that he is not a true lender but is principally concerned with the future earnings of Associates or its increased market value.  Slappey Drive Ind. Park v. United States, 561 F.2d at 582; Segel v. Commissioner, supra at 833.

The timing of the 1988 distribution also indicates that the 1981 transaction effected a contribution to Associates' capital rather than a loan.  That distribution did not occur until more than 7 years after the 1981 transaction, and nothing in the record suggests that Associates similarly delayed payments of its bona fide debts.  O.H. Kruse Grain & Milling v. Commissioner, 279 F.2d 123, 126 (9th Cir. 1960), affg. T.C. Memo. 1959-110.

Moreover, petitioner testified that the distribution was made because Associates was doing well and did not need the money distributed. A distribution of funds under such circumstances points to an equity classification because a corporation normally declares dividends only when it has ample cash, and shareholders ordinarily acquiesce in such a policy due to their primary concern for the health of an enterprise and its long-term success. Slappey Drive Ind. Park v. United States, supra at 582. Petitioner's statement indicates that he possessed the motivations of a shareholder and believed it appropriate to decide when to make payments on the same basis that corporations customarily use to make dividend decisions. Id. Moreover, Associates had never distributed a dividend, or paid a salary, to petitioner prior to the distribution in issue. The foregoing circumstances suggest that the 1981 transaction resulted in a contribution to Associates' capital, rather than a loan. Id.

We believe that an outside lender would not have made a loan to Associates on the terms given by petitioner. We conclude that the characteristics of the 1981 transaction and the 1988 distribution were substantially at variance with those of a normal debt transaction, indicating that the 1981 transaction did not result in a loan as a matter of economic reality. Segel v. Commissioner, supra at 833-834.

We have considered the remaining factors and circumstances in the record, and, to the extent they are pertinent, they are

either neutral or do not outweigh the circumstances set forth above that indicate that the 1981 transaction effected a contribution to Associates' capital rather than a loan. Moreover, petitioner has neither shown nor argued that the distribution to him cannot be characterized as a dividend in whole or part because Associates lacked earnings and profits. Consequently, we shall assume that Associates had sufficient earnings and profits for purposes of this case. Based on our consideration of the entire record, we find that the distribution received by petitioner from Associates during 1988 constituted a dividend rather than a repayment of a loan.

We next consider the amount of the dividend distributed by Associates. Respondent determined that the amount of the dividend was $125,000, based on the 1987 corporate return, which reported a decrease in loans to Associates from its shareholder in that amount. Petitioner admits that he received $117,164.91, an amount to which the parties have stipulated, but contends, relying on his testimony, that he received no more than that amount. Petitioner could not explain why the 1987 corporate return reported the $125,000 decrease in liabilities.

Although petitioner's testimony concerning the transactions in issue lacked sufficient detail in some respects, we found him to be credible. Moreover, the information reported on the corporate returns that purportedly reflects the transactions in issue is not consistent. The 1980 corporate return reports an

increase in shareholder loans of approximately $123,000, while the 1987 corporate income tax return reports a decrease in those loans of $125,000.[5] The record does not suggest that any transactions other than the ones in issue could have affected those figures. Moreover, petitioner testified that he accepted a sum approximating the amount he had paid on Associates' behalf in settlement of his "loan". Petitioner may therefore have received only the distribution to which the parties have stipulated while Associates may have treated the full amount of the "loan" as having been discharged for reporting purposes regardless of any discrepancy between the two amounts.

Accordingly, we find that petitioner received only $117,164.91 from Associates during 1988.

To reflect the foregoing,

Decision will be entered under Rule 155.

---

[5] Respondent notes that the 1987 corporate return may reflect payments made during calendar year 1987 as well as the distribution that occurred during 1988 because Associates used a tax year ending Sept. 30, 1988. However, any distribution that petitioner might have received during 1987 would not be taxable to him for 1988, the year in issue. Petitioner, moreover, testified that he received no distributions from the corporation prior to 1988.