T.C. Memo. 2000-298


UNITED STATES TAX COURT


ESTATE OF JAMES J. RENIER, DECEASED, KENT L. RENIER AND DUBUQUE
BANK & TRUST COMPANY, CO-EXECUTORS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2976-98.          Filed September 25, 2000.


<u>James L. Malone III</u> and <u>Sheri L. Everson</u>, for petitioner.

<u>James S. Stanis</u> and <u>David S. Weiner</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined a deficiency in Federal
estate tax of $326,382.08 and an addition to tax under section
6662(a) of $64,471.42 against the Estate of James J. Renier
(estate).

After concessions, we must decide the following:

1.  What was the fair market value of the 22,100 shares of stock in the Renier Company held by James J. Renier (decedent) at his death on April 10, 1994 (valuation date).

2.  Whether the estate is liable for an addition to tax under section 6662(a) for a substantial estate or gift tax valuation understatement.[1]

Unless otherwise noted, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  We incorporate by this reference the stipulation of facts and attached exhibits.  At the time of filing the petition, co-executor Kent L. Renier resided, and co-executor Dubuque Bank & Trust Company had its principal place of business, in Dubuque, Iowa.  Decedent resided in Dubuque, Iowa, on the date of his death, and his will was probated in the Iowa District Court for Dubuque County.

---

[1] The estate also alleged in the petition that respondent erred in disallowing a deduction by the estate for charitable bequests totaling $12,500.  However, the estate made no argument at trial or on brief concerning that allegation, and we consider it abandoned.  See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988); Bowman v. Commissioner, T.C. Memo. 1997-52 n.1, affd. without published opinion 149 F.3d 1167 (4th Cir. 1998).

Since 1899, the Renier family has conducted a retail business in Dubuque. Beginning in the 1950's, the Renier Company (Renier) switched its business focus from musical instruments to the sale of televisions and stereo equipment. In the 1980's, it expanded its product mix to include video camcorders and VCR's.

On the valuation date, televisions and VCR's comprised 47 percent of Renier's sales, with audio systems and components making up another 40 percent, and camcorders and car stereos constituting 10 percent. Another 2 percent of Renier's sales consisted of batteries and electronic accessories, while the remaining 1 percent consisted of cordless telephones. The national annual compound rate of growth from 1989 through 1993 for televisions and VCR's was 4.99 percent; for audio systems and components, 3.07 percent; for camcorders and car stereos, 3.27 percent; for batteries and electronic accessories, 9.44 percent; and for cordless telephones, 5.95 percent. When weighted to reflect the percentage of sales by Renier for each product area, the national annual compound rate of growth for Renier's product mix from 1989 through 1993 was 4.15 percent. Renier's actual sales increased at a compound rate of 8.3 percent from July 1988 through June 1993. However, the majority of Renier's growth during that period occurred between July 1, 1992, and June 30, 1993, during which time sales increased 22.7 percent in part as a result of a major flood in the area that caused many residents to replace their consumer electronic products. Considering only

July 1988 through June 1992, Renier's compound annual growth was just 3.8 percent.

Renier's retail operation consisted of a single 7,200-square-foot store located in a strip mall in Dubuque. Renier was open for business 68 hours per week: 11 hours a day on Monday through Friday, 8 hours on Saturday, and 5 hours on Sunday. In 1994, the city of Dubuque had an estimated population of 57,840. Dubuque's population had declined over 7 percent since 1980 and was not expected to grow rapidly after the valuation date.

On the valuation date, Renier had seven employees, including Kent and Maria Renier, decedent's son and daughter-in-law (Kent and Maria). Kent served as store manager and as a salesperson, and Maria performed clerical and bookkeeping functions. Kent was also responsible for about one-third of Renier's total sales. At various times during the 5 years and approximately 9 months preceding the valuation date, decedent and five other members of his family were employed by Renier. Until September 1993, decedent remained active in the business, meeting customers and handling Renier's advertising and finances. After September 1993, health problems prevented decedent from working the sales floor, but he continued to be involved in Renier's advertising and finances.

Renier's primary competition consisted of national retail chains which operated stores in the Dubuque area. These chain stores offered a much broader consumer electronics product

selection than did Renier and included such stores as Wards, Wal-Mart, K-Mart, Target, Radio Shack, and Sears.  Additional competition came from local independent businesses in Dubuque that sold consumer electronic products.

The Dubuque area retail environment became more competitive in the 1980's and early 1990's as large discount stores, chain stores, and warehouse clubs increased product offerings and offered low prices to gain market share.  These larger businesses purchased inventory at low prices due to volume purchases, utilized sophisticated inventory control systems to manage inventory, and effectively leveraged advertising expenditures due to the operation of numerous retail outlets.

Although Renier could not purchase inventory at the prices available to the chains and discount stores, it was able to achieve some discounts through participation in a buying cooperative made up of independent retailers.  In addition, because Renier was not highly leveraged and maintained ample working capital, it was further able to reduce its inventory costs by taking advantage of prompt payment discounts offered by many vendors.

Renier computed its income for tax and financial reporting purposes on the basis of a fiscal year ending June 30.  Renier's pretax profit margin from July 1, 1988, through the valuation date substantially exceeded the national industry average for retailers of consumer electronics.  However, no meaningful growth

trend during this period is discernible, because for some time prior to its fiscal year ended June 30, 1993, Renier overestimated its cost of goods sold as the result of an error in its inventory accounting system and, consequently, underreported its net income. This error was addressed in 1996, at which time Renier filed amended corporate income tax returns for 1993 and 1994, reporting increased taxable income for those years. These changes resulted in Renier's having additional income tax liabilities totaling $137,038 for the period beginning July 1, 1992, and ending on the valuation date,[2] which Renier paid in 1996. Renier also revised its financial statements to reflect the changes. After the revisions, Renier had total pretax net income from July 1, 1988 through the valuation date of $879,597, and after-tax net income of $579,367.

Decedent became president of Renier in the 1960's and served in that position until his death. At his death, decedent owned 22,100 of the 25,000 outstanding shares of Renier's common stock. Renier's shares have never been listed on any stock exchange or available on any over-the-counter market and have never been publicly traded or privately traded.

The co-executors hired Jules Steinberg to appraise Renier's shares for estate tax purposes. Based on Mr. Steinberg's

---

[2] Renier had increased tax liability for its 1993 fiscal year of $108,495 and increased tax liability of $28,543, on a prorated basis, for the first 9.33 months of Renier's 1994 fiscal year that occurred prior to the valuation date.

appraisal, the estate reported decedent's interest in Renier at a value of $729,742, or $33.02 per share, on the valuation date. In the notice of deficiency, respondent valued decedent's interest in Renier at $1,633,000, or $73.89 per share, on the valuation date.

## ULTIMATE FINDING OF FACT

The fair market value of decedent's 22,100 shares of Renier on the valuation date was $952,000, or $43.08 per share.

## OPINION

### I.  Renier's Fair Market Value

We must decide the fair market value of decedent's shares of stock in Renier on the valuation date.  Both parties rely on expert opinions to support their claimed values.

Fair market value is defined as "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'"  United States v. Cartwright, 411 U.S. 546, 551 (1973)(quoting sec. 20.2031-1(b), Estate Tax Regs.).  The best method to value a corporation's stock is to rely on actual arm's-length sales of the stock within a reasonable period of the valuation date.  See Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982). Since Renier's stock was never publicly or privately traded, all the experts used less direct methods of valuation.

Expert opinions sometimes aid the Court in determining valuation; other times, they do not. See Laureys v. Commissioner, 92 T.C. 101, 129 (1989). We evaluate such opinions in light of each expert's qualifications and all other evidence of value in the record. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). We are not bound, however, to accept any expert opinion when that opinion contravenes our judgment. See id. We may accept an expert opinion in its entirety, see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), or we may selectively use any portion thereof, see Parker v. Commissioner, 86 T.C. 547, 562 (1986).

A. The Experts

Respondent presented the testimony and expert report of Leonard J. Sliwoski to support the deficiency determination. The estate presented the testimony and expert reports of Yale Kramer, of McGladrey & Pullen, LLP, and Allan L. R. Lannom, of Houlihan Valuation Advisors, to support the reported value of Renier's stock.

Respondent's expert, Mr. Sliwoski, considered an asset, income, and market approach to value Renier and concluded that an income approach, using the capitalized value of expected future earnings, should be used exclusively. Based on this approach, Mr. Sliwoski concluded that Renier had a total value of $1,847,698 and that decedent's 88.4 percent interest therein had an approximate value of $1,633,000 on the valuation date.

The estate's first expert, Mr. Kramer, also considered an asset, income, and market approach and ultimately concluded that Renier's valuation should be based on an average of the results indicated by the income and market approaches. Through this averaging process, Mr. Kramer concluded that Renier's shares had an estimated value of $36.89 per share and that decedent's 22,100 shares therefore had a total value of $815,158.50 on the valuation date.

The estate's second expert, Mr. Lannom, did not use an asset or income approach but made two market approach calculations using data on the sales of privately held companies supplied by the Institute of Business Appraisers. In addition, Mr. Lannom applied four different "rules of thumb" to value Renier. Using his market approach and rules of thumb, Mr. Lannom arrived at various values for Renier ranging from a low of $946,000 to a high of $1,100,000. Mr. Lannom then added a "key-man" discount equal to 10 percent of the value of the operating assets. Finally, Mr. Lannom concluded that decedent's 88.4-percent interest in Renier was worth approximately $852,000 on the valuation date.[3]

---

[3] Although Mr. Lannom testified that his estimate of the value of decedent's interest in Renier was $825,000, the calculations in his report, as amended in his trial testimony, indicate that he actually concluded that decedent's interest was worth $852,000 and apparently made a transposing error.

We place no weight on Mr. Lannom's opinion. His report contains no explanation of, or analytical support for, the various "rules of thumb" employed in reaching several of its valuation estimates. Thus, we are largely unable to assess the merits of Mr. Lannom's conclusions. See Rule 143(f)(1). To the extent we are able to form a judgment, we find his analysis unpersuasive. One of his market approach calculations and three of his rules of thumb used gross revenue as the primary determinative factor, without taking profitability into account. This raises doubts about the basis for his conclusions, given that Renier's profitability was high in relation to the industry average. Furthermore, while Mr. Lannom's second market approach calculation used Renier's earnings and one of his rules of thumb used Renier's cash-flow, Mr. Lannom provided no justification for the earnings and cash-flow figures he used. Finally, Mr. Lannom's report provided no factual support for his "key-man" discount. Because of the summary nature and obvious shortcomings of Mr. Lannom's report, we give it no further consideration.

Both Mr. Sliwoski and Mr. Kramer ultimately concluded that their asset approaches did not account for the goodwill inherent in Renier as a going concern. We therefore restrict our analysis to the income and market approaches as applied to Renier by Mr. Sliwoski and Mr. Kramer. We now consider each in turn.

B. Income Approach

In connection with their respective income approaches to valuation, both Mr. Sliwoski and Mr. Kramer concluded that some of Renier's assets were not necessary for its core retail operation. After excluding the income and expenses associated with these "nonoperating" assets, both experts estimated the value of Renier's "operating" assets on the valuation date by capitalizing an estimate of Renier's expected future income. Each expert then added his income-based valuation of Renier's operating assets to an asset-based estimate of the nonoperating assets to produce a total valuation figure.

As part of their income capitalization approaches, the experts agreed that the appropriate starting point for estimating Renier's expected future income was to take an average of Renier's historical reported net income.[4] The experts further agreed that it was necessary to make certain adjustments to

---

[4] Although Mr. Sliwoski believed that cash-flow, rather than net income, was the appropriate income base to capitalize, he concluded that net income was an adequate approximation for cash-flow. In reaching this conclusion, he assumed that Renier's accounts receivable and inventory levels were sufficient as of the valuation date to sustain probable future growth, that required equipment additions would equal Renier's depreciation expense, and that no interest-bearing liabilities, other than short-term liabilities, would be required to finance probable future sales growth. In addition, as discussed infra, since Mr. Sliwoski used a capitalization rate based on returns to both equity and debt, it was necessary for him to add back Renier's interest expense to the income base used in his capitalization formula.

Mr. Kramer used net income as his base for capitalization but believed that an adjustment to the capitalization rate was required to account for the fact that he was employing net income rather than cash-flow as his base.

reported net income in order to "normalize" it; that is, to convert Renier's historical average net income into income that a hypothetical purchaser could expect in the future, by eliminating anomalous transactions and capital structures. However, the experts exhibited significant differences regarding the necessary "normalizing" adjustments. They also had significant differences in computing the capitalization rate that should be applied to normalized income and, to a lesser extent, differences in the methodology for valuing Renier's nonoperating assets. The foregoing differences produced dramatically different results. Mr. Sliwoski valued Renier's operating assets at $1,293,760, to which he added his estimate of the value of Renier's nonoperating assets of $553,938,[5] for a total value of $1,847,698 on the valuation date. Mr. Kramer's income approach, by contrast, resulted in a value for Renier's operating assets of $450,104; i.e., an amount approximately two-thirds lower than Mr. Sliwoski's computation. The difference in Mr. Kramer's estimate for Renier's nonoperating assets was not as dramatic; Mr. Kramer's estimate was $470,925[6] versus Mr. Sliwoski's $553,938.

---

[5] Although Mr. Sliwoski recognized he had double counted a liability of $137,038, he did not modify his computations to correct for this error. Had he done so, Renier's nonoperating assets would have increased by $137,038, and its total value would have equaled $1,984,736. In any event, respondent has not sought an increase in his deficiency determination in connection with this error.

[6] Unlike Mr. Sliwoski's value for nonoperating assets, this
(continued...)

Mr. Kramer's value estimates for Renier's operating and nonoperating assets produced a total value of $921,029 on the valuation date.

We shall consider their differences.

### 1.  Computation of Normalized Income

The experts agreed that the starting point for computing normalized income should be the average of Renier's reported net income[7] for the 69.33-month period preceding the valuation date, July 1, 1988,[8] through April 10, 1994 (base period[9]).  Further, to avoid "unwarranted controversy", Mr. Kramer adopted several of Mr. Sliwoski's normalizing adjustments.  Prior to normalizing,

---

[6](...continued)
number is corrected to account for the double counting of a $137,038 liability in Mr. Kramer's original report.

[7] Mr. Sliwoski started with pretax net income and, after making his normalizing adjustments, subtracted Federal and State income taxes at an estimated combined rate of approximately 38 percent.  Mr. Kramer started with after-tax net income and, when making normalizing adjustments, also accounted for the income tax impact of the normalizing adjustments, at an estimated income tax rate of 34 percent.  Except for the difference in assumed income tax rates, their respective methodologies to account for taxes would produce the same result.

[8] Although Mr. Kramer's report states that he used the period from July 1, 1989, through the valuation date, an examination of the data in the exhibits to his report shows that the period used included the fiscal year starting July 1, 1988, as well.

[9] Although Mr. Sliwoski treats the period from July 1, 1988, through the valuation date as consisting of 5.778 years, and Mr. Kramer uses at various times 69.33 and 69.333 months to describe this period, for the sake of consistency, we have adopted (and treat the experts as having adopted) a base period of 69.33 months.

Renier had pretax net income of $879,597 during the base period and after-tax net income of $579,367. The experts had differences in their normalizing adjustments as follows.

### a. Reasonable Compensation for Related-Party Employees

There is a large difference in the experts' approaches in accounting for excess compensation paid to related-party employees. During the base period, Renier employed decedent and several members of his family, including Kent and Maria on the valuation date. Both Mr. Sliwoski and Mr. Kramer concluded that related-party employees were overcompensated, necessitating a normalizing adjustment to reported net income to approximate income if only arm's-length amounts had been paid for the services rendered. The experts dispute, however, the amount of overcompensation.

To compute a reasonable compensation amount for the services provided by related parties, Mr. Sliwoski assumed that during the base period Renier required the services of only two family members, one providing management and sales services and the other serving as bookkeeper and office manager. Kent and Maria, respectively, were providing these services on the valuation date. Using data from a 1991 Dubuque area wage survey, Mr. Sliwoski concluded that for Renier's fiscal year ended June 30, 1991, the retail manager/salesperson would earn approximately $19.23 per hour and work 2,080 hours per year (40 hours per

week), for an annual salary of $39,998. He further concluded that a bookkeeper/office manager for Renier with Maria's qualifications reasonably would have been paid $7.37 per hour and worked 2,080 hours per year, for a total annual salary of $15,330. To these amounts, Mr. Sliwoski added a fringe benefit equal to 20 percent of base wages for each employee. Finally, Mr. Sliwoski adjusted these results using changes in the consumer price index for 1989 through 1994 to determine reasonable compensation for each year in the base period. Mr. Sliwoski then treated all compensation to related employees that exceeded the foregoing amounts, plus associated payroll taxes, as excess compensation that should be added back to produce normalized income. This resulted in increases to Renier's reported net income for the base period of $357,789, or an average of $61,925 per year.

Mr. Kramer, by contrast, calculated the excess compensation to related employees to be only $15,000 per year, which he divided by 12 and then multiplied by 69.33 to arrive at a total excess compensation of $86,663 during the base period. In reaching the $15,000 per year figure, Mr. Kramer concluded that approximately 15 percent of the time devoted to management duties by related parties was attributable to duplicated effort and therefore constituted excess compensation.

After considering the reasonable compensation adjustments proposed by each expert, we conclude that neither accurately

accounts for Renier's related-party excess compensation. Mr. Kramer's method was unsupported by any objective criteria; his report's assertion that there was a duplication of effort equal to 15 percent of the amounts paid to related-party management appears to be no more than a conclusory guess. The estate cites no data to support the claim that the sales, management, and bookkeeping functions being performed by related parties were actually worth $120,000 per year in the Dubuque area. In addition, the estate concedes on brief that in Renier's fiscal year ended June 30, 1990, Mark Renier, decedent's other son, was paid $100,000 in excess compensation. Mr. Kramer's report, however, fails to account for this figure. For these reasons, we find more reliable Mr. Sliwoski's approach based on actual data from a Dubuque area wage survey.

While we find satisfactory Mr. Sliwoski's basic methodology of attempting to estimate the "market" replacement cost of the necessary services that were provided by related parties, and treating the excess of the amounts actually paid over their market value as a normalizing add-back to income, we nevertheless believe that Mr. Sliwoski's estimate of the replacement cost of the sales and management services provided by related parties significantly understates the services' value. Mr. Sliwoski assumed that the sales and management functions being performed by Kent could be accomplished in a 40-hour work week. Kent testified that he worked in excess of 70 hours per week. While

this claim might be inflated, the record establishes that Renier was open 68 hours per week. We do not believe that Kent's sales and management functions could be duplicated with a 40-hour work week at $19.23 per hour, plus 20 percent in fringe benefits (or total annual compensation of approximately $48,000), as Mr. Sliwoski's postulates. If one considers only Kent's sales function, his annual compensation would exceed $40,000,[10] before considering his multiple management and administrative duties. In addition, Mr. Sliwoski failed to consider that except for the last approximately 7 months of the base period, decedent also actively assisted in Renier's operation. We therefore do not believe Mr. Sliwoski's computations of reasonable compensation for the sales and management functions performed by related parties are reliable.

On this record, we have no alternative but to substitute our best judgment of the value of the sales and management services that were performed by Kent as of the valuation date (and various other family members during the base period). Taking into account the hours claimed in Kent's testimony, it is our judgment that the sales and management functions performed by him could be accomplished in a 60-hour work week. Using Mr. Sliwoski's

[10] Respondent conceded that Kent was responsible for approximately one-third of Renier's annual sales of $1.5 million. If Kent received a commission of 6 to 8 percent on those sales, a commission which Mr. Sliwoski himself conceded was reasonable in the business, plus benefits equal to 20 percent of this amount, his compensation as a salesman would have exceeded $40,000.

documented wage and benefit figures, this assumption produces an annual compensation package of $71,997 (60 hours at $19.23 per hour times 52 weeks plus 20-percent fringe benefits). If this amount is adjusted for inflation for each of the years in the base period,[11] the total for the period is $418,117. When added to Mr. Sliwoski's reasonable compensation estimate for the bookkeeping/office manager functions performed by Maria ($106,832) (the rate and hours assumptions for which we find satisfactory), and increased by Renier's average payroll tax expense of 6.76 percent,[12] the total reasonable compensation expense for related-party employees for the base period is $560,436. When this amount is subtracted from Renier's actual compensation to related-party employees during the base period of $788,889,[13] the excess compensation to related-party employees equals $228,453, or an average of $39,540 per year. Thus, we conclude that a normalizing adjustment in this amount to Renier's

---

[11] Mr. Sliwoski used the consumer price index (CPI) published by the U.S. Census Bureau to adjust for inflation. We make a similar adjustment in our computation. See U.S. Census Bureau, Statistical Abstract of the United States, The National Data Book 495 (119th ed., 1999).

[12] Renier's average payroll tax expense was derived from the average payroll tax rate incurred by Renier during the base period. The difference between this rate and the statutory rate of 7.65 percent applicable during most of the base period is presumably due to fringe benefits not subject to payroll tax. See secs. 3111, 3121(a).

[13] Actual related-party compensation figures were taken from Mr. Sliwoski's report; Mr. Kramer provided no comparable figures.

reported net income is appropriate.

> b.  Adjustment for Income From Excess Working Capital

Both experts agreed that Renier's cash and short-term investments exceeded its working capital needs, that the excess should be treated as a nonoperating asset, and consequently that the interest earned by the excess should be subtracted from reported net income as a normalizing adjustment.  They disagreed, however, on the size of Renier's excess working capital and the method of its calculation.

Mr. Sliwoski concluded that Renier only required working capital equal to 7 days of annual sales (7/365 of annual sales), which resulted in estimated working capital needs during the base period ranging from $24,417 for 1989 to $35,152 for the partial year ending on the valuation date.  Consequently, Mr. Sliwoski made a normalizing adjustment that subtracted all interest earned by Renier during the base period and added back an estimated amount of interest[14] that would have been generated by the working capital he estimated was needed.

Mr. Kramer concluded that Renier required working capital equal to 2 months of average operating expenses during the base period, plus 1.5 times average monthly inventory purchases in 1994, or $259,205 on the valuation date, leaving $362,038 in

---

[14] Mr. Sliwoski computed interest for this purpose at a rate of 5 percent.  To avoid "unwarranted controversy", Mr. Kramer adopted the same rate for purposes of his computations.

excess working capital on that date.  To account for the interest generated by this excess working capital, Mr. Kramer took the excess working capital amount on the valuation date, multiplied it by 5 percent,[15] divided the result by 12 (to get a monthly figure) and then multiplied that amount by 69.33 months.  The result was then subtracted from reported net income as a normalizing adjustment.  Using this formula, Renier's excess working capital generated $104,584 in interest over the base period.[16]

As to which expert's methodology best adjusts for excess working capital, we believe that Mr. Sliwoski's formula substantially underestimates Renier's working capital needs.  For example, for the year ended June 30, 1989, Mr. Sliwoski estimated Renier would require working capital of just $24,417.  However, Renier's financial statement for that year indicates that it

---

[15] See supra note 14.

[16] In his report, Mr. Kramer assumed Renier had only $225,000 in excess working capital, which would have generated approximately $65,000 in interest over the base period.  Mr. Kramer's computation of excess working capital, however, does not account for the double-counted liability of $137,038 conceded during trial by both experts.  When this double counting is corrected, it results in a reduction in Renier's liabilities of $137,038 and a corresponding increase in total assets.  Because Renier's working capital requirements using Mr. Kramer's formula are unaffected by this correction, Mr. Kramer's computation of excess working capital would increase by $137,038 as a result, from $225,000 to $362,038.  Therefore, under Mr. Kramer's formula, the interest generated over the base period from the increased figure for excess working capital is $104,584, rather than $65,000.

spent $920,861 on inventory purchases and had operating expenses of $363,304, for total expenditures of $1,284,165.  Thus, although Renier had outlays averaging over $107,000 per month in fiscal 1989, Mr. Sliwoski assumed Renier would require less than one-fourth of that amount as working capital.  This estimate is unduly low, particularly in light of the fact that Renier paid for its inventory with cash in order to take advantage of early payment cash discounts offered by trade creditors.  Mr. Sliwoski's estimates for the other years are no more reasonable. Given the obvious shortcomings of Mr. Sliwoski's working capital estimates, we reject his methodology in favor of that used by Mr. Kramer, which not only left sufficient working capital to cover Renier's operating expenses but also provided additional working capital to purchase inventory with cash.  Based on Mr. Kramer's formula, as adjusted to account for the double-counted liability of $137,038, we conclude that $104,584 should be subtracted from Renier's reported net income as a normalizing adjustment to account for the interest generated by its excess working capital.

### c. Spread for Cost-of-Goods-Sold Adjustment

The parties agree that for a number of years Renier had used an incorrect inventory accounting system that overstated cost of goods sold.  The errors in cost of goods sold were corrected by means of adjustments to the 1993 and 1994 fiscal years, which resulted in reported net income for those years that substantially exceeded amounts in the preceding 4 years.  The

experts disagree on the appropriate normalizing adjustment for the correction of the inventory error.

Mr. Sliwoski believed that, since average income for the 69.33-month base period (including the correction years) was being used, no further adjustment was necessary. The averaging of the correction years' income with the income of the 4 precorrection years (which income was almost certainly understated) would produce an accurate average for the 69.33-month period, in his view. This position effectively "spread" the cost of goods sold adjustment over the 69.33-month base period.

Mr. Kramer, however, believed that the cost-of-goods-sold adjustment should be spread over 10 years, on the grounds that Renier had sold the same product line for approximately 20 years and "it was estimated" that the erroneous inventory method had been used "for at least half of that period". As a result, Mr. Kramer spread the cost-of-goods-sold adjustment over a 10-year period and excluded from normalized income some 50.67 months' worth of the adjustment which fell outside the base period.

With respect to the cost-of-goods-sold adjustment, we conclude that the estate has failed to show error in respondent's approach. The estate has offered scant evidence of the nature of the inventory adjustment; there is no evidence in the record of the exact nature or duration of the error in accounting for cost of goods sold. Such evidence was presumably available to the

estate or executors.  On this record, we do not believe the estate has shown that a 10-year spread of the inventory adjustment is appropriate.  We accordingly conclude that Mr. Sliwoski's treatment of the cost-of-goods-sold adjustment in computing normalized income is the appropriate one.

#### d. Adjustment for Partial Year

The experts also disagree on how to "annualize" the income from the partial fiscal year from July 1, 1993, through the April 10, 1994, valuation date for purposes of computing average income for the base period. Mr. Sliwoski extended the partial year income data pro rata to a full fiscal year, added this amount to the net income from the previous 5 years and divided the result by 6. Mr. Kramer, on the other hand, simply added the net income from the 9.33 months of the partial fiscal year to the income from the previous 5 years, divided the result by 69.33 months, and multiplied the result by 12 to compute the average.

The estate finds fault with Mr. Sliwoski's approach, and we agree. By simply extending the results of the 9.33 months of the partial fiscal year pro rata into 12 months, Mr. Sliwoski effectively postulates level income over each month of the fiscal year. We agree with the estate that this approach distorts Renier's income. The first 9.33 months of Renier's fiscal year include the holiday season, a period of high retail volume. The assumption that the average of the first 9 months of the fiscal year would be replicated in the last 3 is highly unlikely. In addition, both sides have conceded that 1994 income was anomalous, due to the correction of the inventory error. As a result, we believe a more accurate average is achieved by averaging the actual results of the first 9.33 months of fiscal 1994 with the preceding 5 fiscal years, as Mr. Kramer has done.

### e. Inclusion of Interest Expense

Because Mr. Sliwoski used a capitalization rate that incorporated an assumed cost of debt that a purchaser of decedent's interest would incur to effect the purchase, he was required for consistency to add back Renier's interest expense to his income base, so that normalized income would approximate the investment return available to both equity and debt.  Mr. Kramer used a simpler "return on equity" to formulate the capitalization rate he employed.  As more fully discussed infra, we conclude that the appropriate capitalization rate is a simple return on equity as used by Mr. Kramer, since the interest being valued here is an equity interest.  Accordingly, it is not appropriate to add back Renier's interest expense when computing expected future income available to equity alone.

### f. Adjustment for Income Taxes

Both experts account for the effect of income taxes as part of normalizing Renier's income.  Mr. Sliwoski normalized reported pretax net income and then adjusted for Federal and State income taxes at an assumed combined rate of approximately 38 percent, whereas Mr. Kramer used reported after-tax net income, and then adjusted for income taxes associated with the net impact of the normalizing adjustments using the average of the actual combined Federal and State income taxes paid by Renier over the base period.  Mr. Sliwoski provided no justification for his assumed rate, while Mr. Kramer's rate reflected Renier's historic

average.  Because Mr. Kramer's approach is consistent with Renier's actual income tax liabilities over the base period, we believe it is more accurate.  We therefore adopt his method of using after-tax net income and taking account of the income tax effect of normalizing adjustments at Renier's historic average rate of 34 percent.

### g.  Conclusion

Based on the foregoing, we conclude that the following normalizing adjustments should be made to Renier's reported net income after taxes for the base period:

Adjustments to Base Period Net Income
(negative amounts in parentheses)

| | |
|---|---|
| Excess related-party compensation | $228,453 |
| Interest generated by Renier's excess working capital | (104,584) |
| Depreciation[1] | 35,012 |
| Property taxes[1] | 1,782 |
| Automotive expenses[1] | 6,650 |
| Capital loss[1] | 9,219 |
| Rental income[1] | (6,000) |
| Total adjustments before tax | 170,532 |
| Tax on adjustments (at blended Federal and State rate of 34 percent) | (57,981) |
| Total adjustments after tax | 112,551 |

[1] The experts agreed to the normalizing adjustment amounts with respect to depreciation, property taxes, automotive expenses, capital loss, and rental income.

By adding $112,551 in adjustments to Renier's after-tax net income for the base period of $579,367, we arrive at normalized income for the period of $691,918. By dividing this figure by the 69.33 months in the base period and multiplying the result by 12, we calculate Renier's expected future annual income available to equity at $119,761.

### 2. Calculating the Capitalization Rate

The experts reached widely divergent conclusions regarding the appropriate rate to use in capitalizing Renier's expected future income. Mr. Sliwoski concluded that the rate should be 10 percent, whereas Mr. Kramer set it at 22 percent. The principal source of this difference concerns whether the capitalization rate should be computed based on the return on equity that a hypothetical buyer would require (Mr. Kramer's view) or should consist of a weighted average of the return on equity as well as the return on an assumed amount of debt that a hypothetical buyer would incur to acquire decedent's interest in Renier (Mr. Sliwoski's view). In addition, the experts disagreed regarding the estimate of the rate of growth in Renier's future earnings that should be factored into the computation of the capitalization rate.

### a. Weighted Average Cost of Capital or Return on Equity

Mr. Sliwoski estimated the return on equity that a hypothetical buyer would require in calculating a value for

Renier at 24.76 percent, quite close to Mr. Kramer's estimate of 24.90 percent.  Mr. Sliwoski then reduced this required rate of return by 6 percent to account for Renier's estimated growth after the valuation date.[17]  Mr. Sliwoski also believed that the capitalization rate should reflect a "weighted average cost of capital"; that is, a blending of the rate of return on equity with the cost of debt incurred in a hypothetical purchase, which rate he estimated would be 2 percent above prime, or 8.45 percent, on the valuation date.  Mr. Sliwoski further computed an after-tax cost of the debt by discounting it 38 percent.  Using the assumption that a purchase of decedent's interest would be financed 65.5 percent with debt and 34.5 percent with equity, Mr. Sliwoski computed the weighted average cost of capital as follows:

<u>Weighted Average Cost of Capital Per Mr. Sliwoski</u>

| Financing Component | Percentage of Financing Component | Before Tax Cost of Financing Component | Income Tax Adjustment | After Tax Cost of Financing Component |
|---|---|---|---|---|
| Debt | 65.5% | 8.45% | 62.0% | 3.43% |
| Equity | 34.5% | 18.76% | NA | <u>6.47%</u> |
| Total | | | | 9.90% or approximately 10% |

Thus, the effect of Mr. Sliwoski's weighted average is to reduce the capitalization rate from 18.76 percent (24.76 percent

_____

[17] Mr. Kramer also believed that Renier's estimated growth rate should reduce its capitalization rate.

estimated return on equity less 6-percent growth rate in earnings) to 10 percent.

We are not persuaded by Mr. Sliwoski's approach.  This Court has often rejected the use of a weighted average cost of capital in valuing an equity interest in a closely held corporation. See, e.g., Estate of Hall v. Commissioner, 92 T.C. 312, 341 (1989); Estate of Maggos v. Commissioner, T.C. Memo. 2000-129; Estate of Hendrickson v. Commissioner, T.C. Memo. 1999-278; Furman v. Commissioner, T.C. Memo. 1998-157.  This approach has also been criticized in valuation commentary.  See Bogdanski, Federal Tax Valuation, par. 3.05[5][b] (1996 & Supp. 1999), and authorities therein cited.  Although respondent cites Gross v. Commissioner, T.C. Memo. 1999-254, as support for the use of this method, we note that in that case, the corporation's actual borrowing costs were incorporated in the formula.  Here, Mr. Sliwoski has relied entirely on a set of assumptions about the cost and amount of debt that a hypothetical purchaser of Renier would incur.  The estate argues, and presented evidence, that these assumptions were unrealistic.  We agree.  A local banker testified that financial institutions in the area would not have extended an acquisition loan with respect to a retail business like Renier at anywhere near the amount postulated by Mr. Sliwoski and, further, would have required personal guaranties. Such guaranties raise the effective cost of borrowing.  See Pratt et al., Valuing Small Businesses and Professional Practices 220

(3d ed. 1998) ("it seems reasonable to recognize a premium of upwards of three percentage points to the face value interest rate if personal guarantees are required."). We do not have confidence that Mr. Sliwoski's attempt to estimate a weighted cost of capital is reliable, even if we were satisfied that it represents an appropriate approach for valuing an equity interest. Consequently, we reject the capitalization rate proposed by Mr. Sliwoski and conclude instead that the appropriate capitalization rate is one based upon a return to equity alone, as proposed by Mr. Kramer.

### b. Computation of Capitalization Rate Based on Equity Return

As previously noted, Mr. Sliwoski and Mr. Kramer largely agreed on the rate of return on equity that a purchaser of Renier would require. Mr. Sliwoski concluded that an equity investor would require a 24.76-percent rate of return, while Mr. Kramer concluded that an equity investor would require a 24.90-percent return. The discrepancy between the two figures can be attributed to the risk-free rate of return employed by each expert.[18] Mr. Sliwoski chose as his risk-free rate the 7.26-percent return from 30-year U.S. Treasury bonds on the valuation date, while Mr. Kramer utilized the 7.40-percent rate of return on 20-year U.S. Treasury bonds. This 0.14-percent rate

---

[18] While the experts' other assumptions also differ, these differences are exactly offsetting.

difference equals the difference between Mr. Sliwoski's required rate of return on equity of 24.76 percent and Mr. Kramer's rate of 24.90 percent.  In the instant case, the correct risk-free rate is that of 20-year U.S. Treasury bonds used by Mr. Kramer. We so conclude because both experts developed their estimates of the required rate of return on equity using data from Ibbotson Associates, which publishes equity risk premium data related to 20-year coupon bond maturities, but no such risk premium data for 30-year maturities.[19]  For this reason, we find more appropriate Mr. Kramer's required rate of return on equity of 24.90 percent.

### c. Estimate of Earnings Growth Rate

Both experts agreed that the required rate of return on equity used to convert expected future earnings into a value figure should be adjusted to account for the estimated rate of growth in Renier's earnings after the valuation date.  The experts disagreed, however, in their estimates of Renier's long-term growth rate.  Mr. Sliwoski reduced his required rate of return on equity by 6 percent to account for expected growth in Renier's future income stream, while Mr. Kramer reduced his required rate of return by only 3 percent.

We do not believe either expert used a reasonable estimate of the rate of growth.  Mr. Sliwoski derived his 6-percent growth

---

[19] See Ibbotson Associates, Stocks, Bonds, Bills & Inflation: 1994 Yearbook, 146; see also Pratt et al., Valuing a Business, The Analysis and Appraisal of Closely Held Companies 163, n.10 (3d ed. 1996).

rate based on growth within the consumer electronic products industry and normal inflationary price increases, while Mr. Kramer limited his growth rate to the rate of inflation. Neither of these estimates finds support in the record. Mr. Sliwoski's 6-percent growth rate is based on the consumer electronics industry as a whole and is not tailored to Renier's specific product mix. Renier did not sell personal computers or cellular telephones, both of which exhibited very high growth rates and were included in Mr. Sliwoski's growth-rate estimate. As our findings indicate, the national annual compound growth rate for the items in Renier's product mix, weighted to reflect the percentage of sales of each, was only 4.15 percent from 1989 through 1993. Although Renier's actual sales increased at a compound rate of 8.3 percent from July 1988 through June 1993, the majority of that increase occurred in Renier's fiscal year ended June 30, 1993. Sales in that year, however, were substantially boosted as a result of a major flood in the spring of 1993.[20] If Renier's fiscal year ended June 30, 1993, is excluded, Renier's compound growth rate equals just 3.8 percent, or slightly less than the national average for Renier's product mix. We are thus faced with the problem of how to account for Renier's bumper sales during 1993, only a portion of which should

---

[20] Although the flood likely also boosted sales in the fiscal year that began on July 1, 1993, Mr. Sliwoski did not factor any of this period into his estimate of Renier's growth rate.

be projected into the future as sustainable growth.  Mr. Kramer addressed this issue by adding 5 percent to Renier's expected future annual income prior to capitalization.  We agree that this method correctly accounts for the recent strength in Dubuque's retail economy, while excluding growth attributable to the area's 1993 flood.  We therefore conclude that the most accurate long-term growth assumption for Renier is 4.15 percent.  However, we also believe it is appropriate to adopt Mr. Kramer's methodology of adding 5 percent to Renier's expected future annual income to account for the recent strength in Dubuque's retail economy.  In further support of this conclusion, we note that Renier faced stiff competition from a number of much larger chain retailers, including K-Mart, Radio Shack, Sears, and Wal-Mart, putting in doubt Renier's ability to sustain a high sales growth rate after the valuation date.

### d. Conclusion: Income Valuation of Renier's Operating Assets

Based on the foregoing, we conclude that the appropriate capitalization rate on the valuation date equaled 20.75 percent; namely, Mr. Kramer's discount rate of 24.9 percent, less an estimated long-term growth rate of 4.15 percent.  Furthermore, as previously discussed, this capitalization rate should be applied to 105 percent of Renier's expected future annual income, or $125,749.  Dividing this amount by the capitalization rate, we

conclude that Renier's operating assets had a value of $606,019 on the valuation date.

### 3. Valuing Renier's Nonoperating Assets

Finally, to arrive at a total value for Renier, each expert added to his income valuation of Renier's operating assets his estimate of the asset value of Renier's nonoperating assets. The biggest discrepancy in the experts' valuation of the nonoperating assets concerns their computation of Renier's excess working capital. (Under both experts' methodology, their estimate of excess working capital is added to nonoperating assets.) Because we previously rejected Mr. Sliwoski's estimate of Renier's working capital requirements, we adopt Mr. Kramer's figure and conclude that Renier had excess working capital of $362,038. The experts largely agreed with respect to the value of Renier's remaining nonoperating assets, which Mr. Sliwoski valued at $105,036 and which Mr. Kramer, using primarily Mr. Sliwoski's figures, valued at $108,887.[21] To the extent Mr. Kramer's value exceeds Mr. Sliwoski's, we consider the amount conceded by the estate and therefore conclude that Renier had nonoperating assets totaling $470,925.

---

[21] The remaining nonoperating assets consisted of a residence and two cars. Mr. Sliwoski valued the residence at $81,686 and the two cars at $9,500 and $13,850, respectively, for a total of $105,036. Mr. Kramer valued the residence at $86,975 and the two cars at $8,938 and $12,974, respectively, for a total of $108,887.

C.  Market Approach

Mr. Kramer also used a market approach to value Renier, while Mr. Sliwoski considered but ultimately rejected this approach.  Typically, a market approach valuing the stock of a closely held company involves three considerations:  Past transactions in the company's stock, past offers to purchase the company, or, if neither of these is available, the market values of stocks of comparable companies.  See sec. 20.2031-2(a)-(f), Estate Tax Regs.; Rev. Rul. 59-60, 1959-1 C.B. 237.

Mr. Kramer concluded that a market approach comparing Renier to publicly traded companies was inappropriate because there were no publicly traded companies sufficiently similar to Renier to provide an adequate basis for comparison.  Instead, Mr. Kramer utilized a market approach which he termed the "business broker method".  In Mr. Kramer's analysis, the business broker method postulates that the purchase price of a business equals the market value of the inventory and fixed assets plus a multiple of the seller's discretionary cash-flow, defined as the total cash-flow available to the owner of the business.  Seller's discretionary cash-flow is computed by adding owner's compensation, depreciation, and interest expense to pretax income.  The multiple applied to seller's discretionary cash-flow is determined based on the strengths and risks associated with a particular business; such multiples commonly range between 1 and

2.  In Mr. Kramer's judgment, the appropriate multiple for valuing Renier was 1.5.

We do not find Mr. Kramer's application of the business broker method helpful in valuing Renier.  Mr. Kramer provided no justification for the multiple he chose to apply to Renier's discretionary cash other than his own judgment.  In the absence of any underlying data supporting Mr. Kramer's selection of a multiple, we are unable to assess its appropriateness.  See Rule 143(f)(1).  Thus, on this record the reliability of the business broker method has not been established.

D. Conclusion

Both experts used an asset approach to value Renier's nonoperating assets and concede that such an approach would be inappropriate to value Renier's operating assets.  We agree with their conclusions in this regard.  As Mr. Sliwoski also disregarded his market approach and as we have rejected Mr. Kramer's business broker method, we conclude that the income approach provides the best method for valuing Renier's operating assets.  Therefore, with nonoperating assets of $470,925, using an asset approach, and operating assets of $606,019, using an income approach, we find Renier had a fair market value on the valuation date of $1,076,944, or $43.08 per share.  Consequently, we further conclude that decedent's 22,100 shares in Renier on that valuation date had a value of $952,000.

II.  Addition to Tax

Respondent also determined that the estate was liable for an addition to tax under section 6662(a), which imposes a 20-percent addition for certain underpayments of tax. The addition is imposed where there is an underpayment of estate tax resulting from a substantial estate tax valuation understatement. See sec. 6662(b)(5). A substantial tax estate valuation understatement occurs if the value of any property claimed on an estate tax return is 50 percent or less of the amount determined to be correct. See sec. 6662(g)(1). In the instant case, the estate reported Renier's stock on its return as having a value of $33.02 per share. As we have found that the correct value is $43.08 per share, no substantial estate or gift tax valuation understatement has occurred. Given our conclusion, we need not address whether the estate qualifies for the reasonable cause exception contained in section 6664(c)(1).

To reflect the foregoing,

Decision will be entered
under Rule 155.